# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, <br><br> Plaintiff, <br><br> v. <br><br> NORTH CAROLINA REPUBLICAN PARTY, DONALD J. TRUMP FOR PRESIDENT, INC., ROGER J. STONE, JR., and STOP THE STEAL INC., <br><br> Defendants. | Civil Action No. 1:16-cv-01288 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

### INTRODUCTION

A temporary restraining order (TRO) is urgently needed to protect the right of North Carolina's minority voters to vote free from intimidation, harassment, and coercion. As further explained herein, the allegations and evidence set forth in the accompanying Complaint justify temporary injunctive relief in order to prevent irreparable harm. Comparable relief as to certain Defendants was granted today by the Honorable James S. Gwin in the Northern District of Ohio.[1]

The standard for granting a temporary restraining order is the same as that for issuing a

---

[1] On November 4, 2016, the Northern District of Ohio issued a Temporary Restraining Order against three of the Defendants in this action finding that "there is a legitimate possibility that particular laws may be imminently violated" with respect to voter intimidation. *See* Ex. 7 (Opinion & Order, *Ohio Democratic Party v. Ohio Republican Party*, No. 16-cv-2645 (JG) (N.D. Ohio Nov. 4, 2016), ECF No. 27).

1

preliminary injunction. *See e.g.*, *City of Greensboro v. Guilford Cty. Bd. of Elections*, 120 F. Supp. 3d 479, 486 (M.D.N.C. 2015). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 553 U.S. 7, 20 (2008); *NAACP Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516, 522 (M.D.N.C. 2012).

Immediate relief should be granted here because (1) Plaintiff is likely to succeed on the merits of its claims under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3); (2) irreparable harm to Plaintiff, candidates, and voters will occur in the absence of immediate relief; (3) the balance of equities tips in favor of temporary relief barring Defendants from carrying out their plans to intimidate, harass, and suppress voters; and (4) an injunction barring such flagrant conduct is in the public interest.

## I.      STATEMENT OF FACTS

Donald J. Trump for President, Inc., Trump's close adviser Roger J. Stone, Jr., Stone's organization Stop the Steal, Inc., and the North Carolina Republican Party ("NCRP") are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election. The stated goal of the Trump Campaign, as explained by an unnamed official to *Bloomberg News* on October 27, 2016 is to depress voter turnout, and particularly minority voter turnout—in the official's words: "We have three major voter suppression operations under way." Declaration of Andrew Michaelson, Esq. (hereinafter "Michaelson Decl.") at Ex. 8 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016). It has also become clear in recent weeks

Case 1:16-cv-01288-CCE-JEP   Document 6   Filed 11/04/16   Page 2 of 24

that Trump has sought to advance his campaign's goal of "voter suppression" by using the loudest microphone in the nation to implore his supporters to engage in unlawful intimidation at North Carolina polling places. Trump's exhortations have been amplified by direct and tacit assistance from the NCRP and Stone, who helped pioneer similar tactics in the 1980s before those efforts were blocked by the federal courts. *See* Michaelson Decl. at Ex. 6 (Jeffrey Toobin, *The Dirty Trickster*, The New Yorker, June 2, 2008). All have sought to assist Trump's supporters to carry out the conspiracy's goals.

### a. Trump and Stone Call for Voter Intimidation Based on Bogus Fraud Claims

In the months leading up to the 2016 election, Trump has made an escalating series of statements, often racially tinged, suggesting that his supporters should go to particular precincts on Election Day and intimidate voters—so intimating that otherwise, he will lose the election because of imagined voter fraud. *See* Michaelson Decl. at Ex. 9 (Louis Nelson, *Trump: Without ID Law, Voters Will Vote '15 Times' for Clinton*, Politico, Aug. 9, 2016).

For example, Trump told a crowd in Pennsylvania in August 2016 that "I hope you people can . . . not just vote on the 8th, [but] go around and look and watch other polling places and make sure that it's 100-percent fine. . . . We're going to watch Pennsylvania—go down to certain areas and watch and study— [and] make sure other people don't come in and vote five times. . . . The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on." Michaelson Decl. at Ex. 10 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).

Ten days later, at a speech in Ohio, Trump explained that he did not just mean that supporters should "watch": "You've got to get everybody to go out and watch, and go out and vote," Trump said. "And when [I] say 'watch,' you know what I'm talking about,

right?" Trump has explained that his "watchers" should act in a capacity similar to law enforcement, even though they will not in fact be acting in a law-enforcement capacity. *Id.* In the midst of these comments, the Trump campaign rolled out a signup form on its website for supporters to sign up to be "Trump Election Observers" in order to stop "Crooked Hillary From Rigging This Election," further encouraging his supporters to join in a common plan to "watch" voters in "certain areas" of states like North Carolina for voter fraud. Michaelson Decl. at Ex. 2 ("Volunteer to be a Trump Election Observer," DonaldJTrump.com.).

Trump's exhortations have grown more ominous and more specific as the election draws closer. At an October 1, 2016 rally in Pennsylvania, for example, Trump instructed his supporters to "go check out [other] areas because a lot of bad things happen, and we don't want to lose for that reason." Michaelson Decl. at Ex. 11 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016). Trump and Trump Campaign surrogates like Rudy Giuliani have told supporters that voters of color should be suspected of fraud. Michaelson Decl. at Ex. 12 (Greg Stohr, *Giuliani, Gingrich Raise Specter of Voter Fraud Ahead of Election*, Boston Globe, Oct. 16, 2016). Trump has suggested that Latino voters are undocumented immigrants whom the federal government has allowed to "pour into this country" specifically to vote in the election. Michaelson Decl. at Ex. 13 (Jonathan Swan, *Trump: Government Bringing in Illegal Immigrants to Vote*, The Hill, Oct. 7, 2016). In a nationally televised interview on October 16, Giuliani expressed that voter fraud is concentrated in predominantly minority communities in "inner cities" that support "Democrats." Michaelson Decl. at Ex. 14 (*CNN's Jake Tapper vs. Rudy Giuliani: You're Saying Only Democrats Rig Elections?*, RealClearPolitics, Oct. 16, 2016).

Case 1:16-cv-01288-CCE-JEP   Document 6   Filed 11/04/16   Page 4 of 24

While speaking in Pennsylvania, on October 11, 2016, Trump warned that it is "[s]o important that you watch other communities . . . because we don't want this election stolen from us . . . . And everybody knows what I'm talking about." Michaelson Decl. at Ex. 11 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016). At that same rally, a prominent Trump supporter, U.S. Representative Bill Shuster, made clear that Trump supporters should focus their voter intimidation in Philadelphia, stating: "The people in Western and Central Pennsylvania have to overcome what goes on down in Philadelphia—the cheating." Michaelson Decl. at Ex. 10 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).

Defendant Stone, who has served as a close advisor to Trump throughout his run for President, has meanwhile amplified Trump's message. Stone has a history of engaging in voter intimidation, racist and misogynist hate speech, and incitement to violence. Michaelson Decl. at Ex. 21 (Eric Hananoki, *Trump Ally Roger Stone Has Repeatedly Urged the Killing of Public Figures*, MediaMatters, May 2, 2016).

Stone is currently running a website and organization called "Stop The Steal" that is actively signing up Trump supporters to "volunteer" to fight "voter- fraud and election theft." Stop the Steal, https://stopthesteal.org/ (last visited Nov.2, 2016). #StoptheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence.

Stone and Stop the Steal Inc. are actively recruiting Trump supporters for "exit polling," specifically targeting nine Democratic-leaning cities with large minority populations, including in North Carolina. *See* Michaelson Decl. at Ex. 3 (Oliver Laughland and Sam

5

Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016). As of November 2, 2016, Stone claimed to have organized 2,959 volunteers to engage in this "exit polling" operation. Stop the Steal, https://stopthesteal.org/ (last visited Nov. 4, 2016).

Through a program called "Vote Protectors," Stone has also recruited volunteers to watch polling places. The Vote Protectors website permits any volunteer to download and print official-looking identification badges, and provides scripts for volunteers to interrogate voters on Election Day. Michaelson Decl. at Ex. 17 (Christina Wilke, *Trump-Linked Voter Intimidation Group Releases New Script for 'Citizen Journalists,'* The Huffington Post, Oct. 26, 2016). Volunteers are permitted to tally up votes on the website—for Trump or any other candidate—without any proof that they had spoken to voters or visited a polling site. *See* "Popular Vote (Citizen Exit Polls)," http://stopthesteal.org (last accessed Nov. 2, 2016). Vote Protectors and Stop the Steal discontinued some, but not all, of these practices after exposure by a national media outlet.

Stone's Stop The Steal exit-polling exercise serves no legitimate purpose. The attached expert report of noted polling expert and public-opinion researcher Mark S. Mellman, which draws upon 34 years of experience in the field, establishes that Stone's operation is a thinly veiled effort to intimidate voters in an attempt to influence the election. Expert Report and Declaration of Mark S. Mellman. As Mellman testifies, "[c]onducting exit polls is a difficult, laborious and highly technical process that requires considerable expertise and training." *Id.* To meet these rigorous standards, polling experts demand that exit polls have a number of controls designed to ensure objectivity and independence. None of those controls appear to be built into Stone's initiative, as reflected by public sources on

Case 1:16-cv-01288-CCE-JEP   Document 6   Filed 11/04/16   Page 6 of 24

Defendant Stone's exit-polling operation, including materials and videos in which Stone describes the operation in his own words. Mellman concludes as follows:

> [I]t is my conclusion that the "Exit Poll" that Roger Stone purports to be employing in the 2016 General Election is not in keeping with the accepted methodology, purpose, or practices in this field. The polling that he plans to conduct is unlikely to produce unbiased, reliable results, and, moreover, does not appear to be designed to meet such ends. Mr. Stone's effort seems oblivious to the fundamental techniques accepted throughout the industry as based on reliable principles and methods, as well as very basic well-known facts about exit polling. Given Mr. Stone's stated political biases and the methodology he has employed— i.e., targeting Democratic and minority precincts—his exit polling strategy appears only designed to intimidate voters in an attempt to influence the election and suppress the vote. *Id.*

The notion of widespread voter fraud in modern American politics is itself a myth. Every attempt to verify the presence of voter fraud has proven fruitless. However, the fact that voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the RNC, Trump, and their surrogates such as Stone—from believing it is real.

In contrast, North Carolina has a history of race-based voter suppression, including even state-sponsored suppression, in the name of preventing "voter fraud." *See, e.g.*, *N.C. State Conference of NAACP v. McCrory,* 831 F.3d 204, 223 (4th Cir. 2016) ("The record is replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans.") In North Carolina's 1990 Senate election, for example, concrete evidence surfaced that the Republican Party of North Carolina and Republican Senator Jesse Helms' campaign committee mailed intimidating postcards to African American voters. Specifically, the two groups acted in concert to mail approximately 125,000 postcards providing "false information about voter eligibility" and warning recipients that "vote fraud was punishable by imprisonment." The postcards incorrectly told recipients that they could not vote if they have not lived in their

7

precinct for at least the previous 30 days. Ninety-seven percent (97%) of the recipients were African American. Judge Debevoise of the District of New Jersey found that the North Carolina Republican Party was directly involved with the dissemination of the intimidating materials. He also "criticized the Republican National Committee as failing to do enough to insure that the party's efforts to deter voter fraud did not become an effort to intimidate minority voters." Michaelson Decl. at Ex. 16 (B. Drummond Ayres Jr., *The 1990 Campaign; Judge Assails G.O.P. Mailing in Carolina*, The New York Times, November 6, 1990).

Similarly, in 2013, Pasquotank Republican Party Chair Richard Gilbert targeted intimidation tactics towards young, minority college students. Gilbert challenged the registration of fifty-eight college voters—all of whom were African American students attending Elizabeth City State University, a local historically black university. Two of the fifty-eight were able to successfully regain the right to vote through a hearing.

Most recently, in 2016, state officials were sued over a similar voter suppression scheme. As one media outlet reported, "[t]he North Carolina chapter of the NAACP, along with a handful of individual voters, sued the state's elections board and three county elections boards Monday over an alleged voter purge that it claims disproportionately affected African Americans." Michaelson Decl. at Ex. 19 (Tierney Sneed, *NAACP Sues North Carolina Over Alleged Voter Purge Targeting Black Voters*, Talking Points Memo, Oct. 31, 2016). The State's most recent voter suppression scheme has the potential to affect thousands of minority voters, including a 100-year-old African American woman who has lived in North Carolina her entire life and voted regularly for the last twenty-four years. Michaelson Decl. at Ex. 22 (Ari Berman, *North Carolina Republicans Tried to Disenfranchise a 100-Year-Old African-American Woman*, The Nation, Oct. 27, 2016). On Wednesday, the Honorable Loretta C. Biggs told "county attorneys that she

8

was 'horrified' by the 'insane' process by which voters could be removed from the rolls without their knowledge. 'It almost looks like a cattle call, the way people are being purged,' Biggs said. 'This sounds like something that was put together in 1901.'" Michaelson Decl. at Ex. 24 (Mark Joseph Stern, *North Carolina Is Engaging in "Insane" Jim Crow–Style Voter Suppression, Says Federal Judge*, The Slatest, Nov. 3, 2016). Today, Judge Biggs determined that the North Carolina plaintiff's concerns were valid; the preliminary injunction was granted. Michaelson Decl. at Ex. 25 (Memorandum Opinion, *North Carolina State Conference of the NAACP v. The North Carolina State Board of Elections*, No. 16-cv-01274 (M.D.N.C Nov. 4, 2016), ECF No. 42).

This case comes on the heels of the Fourth Circuit addressing the intentional effort by members of the 2013 Legislature to suppress African American voting, in large part based on the pretext of preventing virtually nonexistent in-person voter fraud. The Fourth Circuit noted, "the State has failed to identify even a single individual who has ever been charged with committing in-person voter fraud in North Carolina." *North Carolina State Conference of NAACP v. McCrory*. 831 F.3d 204, 235 (4th Cir. 2016). Ultimately, the plaintiffs succeeded in their request for an injunction for all challenged provisions.

Defendants are attempting to reenact this history on November 8, 2016. As the Republican Party's nominee for President, Trump and his campaign coordinate closely with the RNC and NCRP on a wide variety of matters, including overall campaign strategy, public messaging, voter outreach, and field operations. On May 17, 2016, the RNC created a joint fundraising committee with the Trump Campaign specifically to fund the Trump Campaign and its operations, and to elect Republicans "up and down the ballot." Michaelson Decl. at Ex. 1 (Press Release: *RNC & Trump Campaign Announce Joint Agreements*, May 17, 2016).

The Trump Campaign has "relinquished control over many of its tactical decisions" to the RNC. Michaelson Decl. at Ex. 8 (Joshua Green, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 26, 2016).

Trump's running mate, Governor Mike Pence, publicly confirmed that the Trump campaign is working with the RNC and state Republican parties on ballot security measures. At an August 3, 2016 town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Hillary Clinton from "steal[ing] this election." Pence responded: "I will tell you that the Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity." *8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence- live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 28, 2016).

The RNC has delegated "ballot security" initiatives to its agents in North Carolina. The NRCP has urged supporters to act as "eyes and ears on the ground." Michael Williams, the Election Day Operations Director for the NRCP, sent an email to supporters to be on the lookout for anything that is "off" or "awry" at your polling place. Michaelson Decl. at Ex. 26 (Michael Williams, *In case you see anything "off" at your polling place*, October 20, 2016). The NRCP's calls to action are not made in a vacuum. Rather, they are made in the wake of Trump's repeated calls that the election is "rigged," that his supporters must therefore "watch" other polling places, and that when Trump says, "'watch,' you know what I'm talking about, right?" Just as Trump is encouraging voter intimidation, so, too, is the NRCP.

In fact, Charles Hellwig, Vice Chair of the Wake County Republican Party, recently "urged Republican activists to work as poll observers on the lookout for 'fraudulent, illegal and

even outrageous voting violations by the left.'"  Inciting his audience, Hellwig wrote "[n]early every day we see some new example of voter fraud or their attempt to subvert the will of the people, and we have to prepare ourselves for the onslaught of illegal activity that is sure to be attempted at the polls."

In addition, consistent with the Trump Campaign, the NRCP has used unsubstantiated allegations of "voter fraud" to restrict and suppress voting.  Dallas Woodhouse, the NCRP Executive Director and agent of the RNC, disseminated an email to Republican county board members and other party members, to "empower[]" them to "make party line changes to early voting" in order to restrict access to the polls in a manner that will suppress votes of minority communities.  Woodhouse's email echoes sentiments expressed throughout the Trump campaign.  Specifically, it states that his call to action was to prevent "voter fraud" and to "promote safe and secure voting and for rules that are fair to *our* side."  (Emphasis added.)

The conspiracy reaches beyond the defendants.  Trump's supporters in North Carolina, and elsewhere, are responding to his calls to engage in voter intimidation, thereby creating an immediate threat of harm to North Carolina voters.

The *Boston Globe* has reported on Trump supporters who are planning to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest:

> "Trump said to watch your precincts.  I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio.
>
> "I'll look for . . . well, it's called racial profiling.  Mexicans. Syrians.  People who can't speak American," he said.  "I'm going to go right up behind them.  I'll do everything legally.  I want to see if they are accountable.  I'm not going to do anything illegal.  I'm going to make them a little bit nervous."

Michaelson Decl. at Ex. 4 (Matt Viser & Tracy Jan, *Warnings of Conspiracy Stoke Anger*

*Among Trump Faithful*, Boston Globe, Oct. 15, 2016).

Similarly, Harry Miller, purportedly of Palm Beach, Florida, tweeted in response to Trump's calls for election observers that he would be "wear'n red at polls. . . .  We gonna be watch'n fer shenanigans . . . haul ya away . . . ."  Michaelson Decl. at Ex. 5 (Jackbgoode1, Twitter (Aug. 19, 2016, 7:43 P.M)).  The tweet included a picture of a pickup truck with Florida plates and a person-sized cage built into the bed, surrounded by American flags.  *See id.*  Miller has over 20,000 Twitter followers.  *See generally* Harry Miller (@jackbgoode1), Twitter, https://twitter.com/jackbgoode1 (last visited Oct. 28, 2016).

According to several newspapers, "a cadre" Trump supporters holding similar beliefs about voter fraud "plan to be in Charlotte" as "part of" Defendant Roger Stone's "Stop the Steal" movement.  Michaelson Decl. at Ex. 27 (Anna Douglas, *Trump Supporters Head to Charlotte to Guard Against 'Rigged' Election*, October 28, 2016).

There have, specifically, been acts of intimidation in North Carolina, where early voting is well underway.  One North Carolina Trump supporter and one Board of Education candidate for the upcoming election have armed themselves with a baseball bat, which is marked "TRUMP" for all to see.  The Trump supporter, who is also a poll worker, has been spotted walking "directly across the street from the Board of Elections office," where early voting takes place, carrying the baseball bat.  And the Board of Education candidate, Sherry-Lynn Womack, who is also a Republican, has been spotted walking behind the poll worker carrying the "TRUMP" baseball bat and posing for photos holding the "TRUMP" baseball bat.  Michaelson Decl. at Ex. 28 (Lee County (NC) Democratic Party, Facebook, https://m.facebook.com/leedemocrats/posts/1165694400176498 (October 28, 2016, 7:03 P.M.)).

Also in North Carolina, according to one report, "someone showed up to early voting

with a badge saying 'poll observer' and was photographing and videotaping cars coming and going and 'generally being an intimidating factor there.'"

Due to the aforementioned rhetoric and suppression tactics, North Carolina voters are suffering irreparable harm at the polling place. For example, upon information and belief, Craven County Republicans have been intimidating African American voters outside an early voting location and calling Secretary Hillary Rodham Clinton a crook. Also in Craven County, upon information and belief, a former Republican official catcalled and intimidated women who came to vote. Media outlets have gathered additional instances of voter suppression in North Carolina. *See e.g.*, Joe Killian, *Election watchdogs worry voter intimidation could depress turnout*, NC Policy Watch (Nov. 2, 2016).

## II.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### a. Defendants Have Violated Section 11(b) Of The Voting Rights Act.

Plaintiff is likely to prevail on its claim that Defendants have violated Section 11(b) of the Voting Rights Act codified at 52 U.S.C. § 10307(b). That statute provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).[2] Congress intentionally drafted Section 11(b) "not [to] require proof that racial discrimination motivated the intimidation, threats, or coercion," *Willingham v. Cty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *see Cameron v. Johnson*, 262 F. Supp. 873, 884 n.9 (S.D. Miss. 1966) (same). Section 11(b) "on its face prohibits *any* intimidation, threat, or coercion, whether done by a public official or

---

[2] Section 11(b) affords a private right of action. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *Gray v. Main*, 291 F. Supp. 998, 999-1000 (M.D. Ala. 1966); *see also* 28 U.S.C. § 1343(a)(4).

13

by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968).[3]

The operative words of Section 11(b)—to "intimidate," "threaten," and "coerce," or to attempt to do so—should be given their commonly understood meaning. *See, e.g.*, *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *see also* Merriam Webster ("intimidate": "to make timid or fearful"; "to compel or deter by or as if by threats"); *id.* ("threaten": "to utter threats against"; "to hang over dangerously"; "to cause to feel insecure or anxious"); *id.* ("coerce": "to restrain or dominate by force"; "to compel to an act or choice"; "to achieve by force or threat").[4] The statutory terms cover not only the most powerful levers of the state, such as "arrest and prosecution," *see Cameron*, 262 F. Supp. at 897, but also plainly apply to acts carried out by private individuals.

Section 11(b)'s reach is not restricted to overt acts of violence. Indeed, courts assessing comparable language in other civil rights statutes have held that "intimidating" and "threatening" includes less overt conduct. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (Posner, J.) (even if the intimidating and threatening conduct was not as "ominous, frightening, or hurtful [as] burning a cross . . . or assaulting the [victim] physically," there exist "less violent but still effective[] methods" by which an offender can frustrate a victim's protected rights, such as through "a *pattern* of harassment"); *see also, e.g.*, *Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 613 (D.N.J. 2000).

Courts assessing voter intimidation claims have looked to whether the challenged

---

[3] *See Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (Section 11(b) "is to be given an expansive meaning").

[4] *Available at* http://www.merriam-webster.com/dictionary.

conduct would reasonably intimidate, threaten, or coerce voters. For example, during the 2004 election cycle, Senator Tom Daschle argued that certain conduct committed by Republican candidate John Thune, the South Dakota Republican Party, and their agents violated Section 11(b): "[f]ollowing Native American voters at [a] polling place . . . and standing two to three feet behind Native American voters, and ostentatiously making notes"; "[f]ollowing Native American voters out to their cars after they have voted, walking up to their vehicles, and writing down their license plate numbers"; and "[h]aving a loud conversation in a polling place, where Native Americans were voting, about Native Americans who were prosecuted for voting illegally in Minnesota." Michaelson Decl. at Ex. 18 (*Daschle v. Thune*, Complaint at 5-6, Civ. 04-4177, D.S.D., Nov. 1, 2004). Daschle claimed that "[t]he persons carrying out these activities are part of a large group of Republican Thune supporters who have come to South Dakota from across the country, and who are poised to repeat the same conduct in Native American voting places across South Dakota . . . on Election Day." *Id.* at 6. The district court granted a temporary restraining order and found Daschle was "likely to succeed" on his Section 11(b) claim, "as the Court finds that there was intimidation particularly targeted at Native American voters . . . by persons who were acting on behalf of John Thune." Michaelson Decl. at Ex. 20 (*Daschle v. Thune*, TRO at 2, Civ. 04-4177, D.S.D., Nov. 2, 2004). Although Daschle alleged intent, the district court explained that "[w]hether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters." *Id.*; *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (concluding that the "inevitable effect" of challenged conduct would be to deter voters).

Just as in the *Daschle* case, such intimidating conduct should be enjoined here. The

allegations in the Complaint and the material set forth herein and provided with this motion show that Defendants and their agents are engaged in a concerted effort to intimidate, threaten, and coerce lawful voters from exercising their right to vote.  Even if those efforts have not yet achieved success, Defendants have already *attempted* to induce fear and anxiety among minority voters in North Carolina, and likewise taken steps designed to prevent minority voters from voting.  *See supra*, at 2-13.

Such planned conduct is indistinguishable from the allegations that the *Daschle* court found more than sufficient to constitute intimidation and threats in violation of Section 11(b) and therefore support a TRO.  For these reasons, Plaintiff has provided more than sufficient information to establish Defendants' intent to intimidate and threaten voters under Section 11(b).

### b.  Plaintiff Is Likely To Show That Defendants Have Violated The Ku Klux Klan Act, 42 U.S.C. § 1985(3).

Plaintiff is also likely to prevail on its claim that Defendants have violated the Ku Klux Klan Act of 1871 (the "Klan Act").  Plaintiff's claim arises under 42 U.S.C. § 1985(3)'s bar on conspiracies to suppress voters "by force, intimidation or threat."  The Ninth Circuit has referred to that type of a § 1985(3) conspiracy as "a conspiracy to interfere with federal elections."  *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc).  A straightforward reading of the statutory text, coupled with case law interpreting the Klan Act, makes clear that Plaintiff's claim in this case is likely to succeed.[5]

---

[5] Plaintiff is not required to prove that Defendants are motivated by racial or other class-based animus, as would be required to prevail on a claim for violations of the other two conspiracy bars in § 1985(3).  *Kush v. Rutledge*, 460 U.S. 719, 721 (1983) (analogizing the anti-voter suppression conspiracy bar at issue here to 42 U.S.C. § 1985(2), which does not require a racial or other class-based animus).  But even were that requirement to apply, the explicit targeting of minority areas and voters alleged in the Complaint is sufficient to demonstrate a likelihood of success on that aspect as well.

16

To make out a violation of the latter part of § 1985(3) at issue here, a plaintiff must allege and prove the following four elements: (1) a conspiracy; (2) to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Cf. United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).

First, Plaintiff is likely to succeed on the merits of its claim that Defendants have engaged in a conspiracy. "A civil conspiracy is combination of two or more persons to an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Ammlung v. City of Chester*, 494 F.2d. 811, 814 (3d Cir. 1974). As the Sixth Circuit has elaborated,

> Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).

Plaintiff has alleged facts likely to prove that Defendants have agreed, tacitly and explicitly, to a "single plan" to suppress voting by Democratic, and predominantly non-white, voters in the 2016 Election, and that each individual Defendant shares in the "general conspiratorial objective." *See supra*, at 2-13. Trump has repeatedly exhorted his followers to "go check out [other] areas" and to "go out and watch . . . and when [I] say 'watch,' you know what I'm talking about, right?" *Supra*, at 4-5. Stone and his organization Stop the Steal Inc. have amplified Trump's recruiting call. *Supra*, at 6-7. These efforts have the backing of the

17

NCRP and RNC.  Dallas Woodhouse, the Executive Director of the NCRP put out the call to get in line with party politics.  And, Trump's running mate, Indiana Governor Mike Pence, has admitted in public that "the Trump Campaign and the Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity."  *8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-    video/video/pence-live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 28, 2016).  Defendants have not only agreed on a common plan; they are boasting about it in public, and seeking to recruit others to their cause.

Second, Plaintiffs will likely prove that the conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat," for the reasons laid out above. Trump has repeatedly exhorted his followers in racially loaded language to descend upon majority-minority polling locations and act in a law-enforcement capacity—or else, Trump has warned, he will lose the election.  A Trump Campaign official admitted that the Campaign is actively engaged in "major voter suppression operations."  Stone's Vote Protectors website permits any volunteer to download and print official-looking identification badges.  *Supra*, at 6. Third, each co-conspirator has performed an act in furtherance of that conspiracy.  Trump regularly issues calls to "watch" "certain areas" of the country.  Defendants Stone and Stop the Steal Inc. have organized an "exit polling" operation targeted at minority voters in locations including in North Carolina, and Stone directs the Vote Protectors effort to recruit poll watchers bearing official IDs to intimidate voters.  Without immediate relief, North Carolina voters will suffer the deprivation of their right to vote on account of the co-conspirators' intimidation.[6]

---

[6] Defendants cannot rely on the First Amendment for permission to intimidate and harass voters under the guise of poll-watching, as there is "no support" for "the proposition that 'poll watching' is a fundamental right under the First Amendment."  Michaelson Decl. at Ex. 23 (*Republican Party of Pennsylvania v. Cortés*, Civ. No. 16-05524, Dkt. 21 at 22, E.D. Pa., Nov. 3, 2016); *see Dailey v. Hands*,

## III. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

In the absence of injunctive relief, Defendants' plans to intimidate minority voters are likely to succeed. That harm will be occasioned both by the loss of votes for Plaintiff's supported candidates, and by loss of voting rights by lawful North Carolina voters. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008).

In the absence of preliminary relief, Plaintiff will suffer "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). The Third Circuit has previously found irreparable harm in the context of an upcoming election based on the notion that denial of "voting and associational rights"—including the ability to "vote for candidates who represent their beliefs"—"cannot be alleviated after the election." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); *see Fish v. Kobach*, ___ F.3d ___, 2016 WL 6093990, at *30 (10th Cir. Oct. 19, 2016) (irreparable harm where "over 18,000 Kansans stood to lose the right to vote in the coming general elections"); *see also Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

---

No. 14-cv-423-KD-M, 2015 WL 1293188, at *4 (S.D. Ala. Feb. 20, 2015), *report and recommendation adopted*, Mar. 23, 2015 (same); *see Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 596 (D.N.J. 2009) (argument that consent decree bar on RNC "ballot security activities" "infringes on activity protected by the First Amendment" is "meritless"), *aff'd*, 673 F.3d 192 (3d Cir. 2012); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching . . . has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) (same).

Case 1:16-cv-01288-CCE-JEP   Document 6   Filed 11/04/16   Page 19 of 24

## IV.     THE BALANCE OF EQUITIES FAVORS PLAINTIFF

### a. Preventing Voter intimidation And Coercion Is A Critical Interest Enshrined In Federal Law.

"[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part).  Indeed, the constitutional interest at stake in this litigation is the voters' "most precious" "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).  The interest in "protecting voters from confusion and undue influence" is "compelling." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion of Blackmun, J.).

There is no countervailing right of Defendants and their agents to poll-watch or observe elections, as those activities in federal elections are permissible only insofar as they comply with the federal laws proscribing voter intimidation.[7]  Even activities that are lawful under state law will violate Section 11(b) where the purpose and effect of such activities is to interfere with the right to vote.  *See United States by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 348 (E.D. La. 1965) ("acts otherwise lawful may become unlawful . . . if the purpose and effect of the acts is to interfere with the right to vote").

### b.  Widespread Or Systemic Voter Fraud Is A Myth.

The claimed rationale for the conspiracy in which Defendants are engaged is to combat alleged "voter fraud."  But widespread voter fraud is a myth.

The courts that have examined the evidence have concluded that widespread voter fraud

---

[7]  *See* 42 U.S.C. § 1985(3); 52 U.S.C. § 10307(b); *see also* U.S. Const. art. I, § 4 ("Congress may at any time by Law make or alter [state] Regulations" governing congressional elections); *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (the Elections Clause "embrace[s] authority to provide a complete code . . . in relating to . . . protection of voters").

does not exist. As addressed above, the Fourth Circuit deemed voter fraud "virtually nonexistent." *North Carolina State Conference of NAACP v. McCrory*. 831 F.3d 204, 235 (4th Cir. 2016). Similarly, In a challenge to Pennsylvania's voter ID law, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere. *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014). And, a federal judge in North Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent." Michaelson Decl. at Ex. 15 *Brakebill v. Jaeger*, No. 16-civ-00008 (DLH), Dkt. No. 50, Aug. 1, 2016).[8] Mass coordinated efforts to combat it are misguided at best and pretextual at worst.

## V. TEMPORARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

### a. The Preliminary Relief Plaintiff Seeks Would Simply Enforce Federal Law.

The preliminary relief that Plaintiff seeks would enforce federal law securing the right to vote and state law enacted to ensure the integrity of elections while protecting the right of lawful voters to participate in the process free of intimidation, threat, or coercion.[9] Such an injunction advances the public interest.

### b. The Public Interest Is Advanced By Securing The Right To Vote, Not By Its Suppression.

"In the absence of legitimate, countervailing concerns, the public interest clearly favors

---

[8] *See also Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016); *League of Women Voters*, 769 F.3d at 246; *Crawford*, 553 U.S. at 194; *Lee v. Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016).
[9] Plaintiff's requested relief would also further the interests of North Carolina statutory provisions that regulate poll-watching activity and bar interference with voters. *See* N.C. Gen. Stat. Ann. § 163-45.

Case 1:16-cv-01288-CCE-JEP   Document 6   Filed 11/04/16   Page 21 of 24

the protection of constitutional rights, including the voting and associational rights of . . . candidates, and their potential supporters." *Hooks*, 121 F.3d at 883-84; *see League of Women Voters*, 769 F.3d at 247; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote") (internal quotation marks omitted).

Defendants cannot be permitted to engage in conduct that threatens the most basic right of voters to cast their votes free of coercion and intimidation.

## CONCLUSION

This Court should grant Plaintiff's motion for temporary relief.

11/04/2016                                         Respectfully submitted,


                                                   /s/ John R. Wallace
                                                   ———————————————————————

                                                   John R. Wallace (NC Bar No. 7374)
                                                   WALLACE & NORDAN  L.L.P.
                                                   3737 Glenwood Ave., Suite 260
                                                   Post Office Box 12065  (27605)
                                                   Raleigh, North Carolina  27612
                                                   Telephone: (919) 782-9322
                                                   Facsimile: (919) 782-8113
                                                   JRWallace@WallaceNordan.com

                                                   Marc E. Elias
                                                   PERKINS COIE LLP
                                                   700 Thirteenth Street N.W., -Suite 600
                                                   Washington, D.C. 20005-3960
                                                   Telephone: (202) 654-6200
                                                   Facsimile: (202) 654-6211
                                                   MElias@perkinscoie.com

Michael J. Gottlieb
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, DC 20015
(202) 237-2727
mMichaelson@bsfllp.com

Dawn L. Smalls
Bret Vallacher
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300
dsmalls@bsfllp.com
bvallacher@bsfllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2016, a copy of the foregoing Memorandum of Law In

Support Of Temporary Restraining Order and/or Preliminary Injunction and supporting

documents were filed electronically.  Notice of this filing will be sent by operation of the Court's

electronic filing system to all parties indicated on the electronic filing receipt.  All other parties

will be served in accordance with the Federal Rules of Civil Procedure.  Parties may access this

filing through the Court's System.


11/04/2016                                    Respectfully submitted,


                                              /s/ John R. Wallace
                                              _____

                                                John R. Wallace (NC Bar No. 7374)
                                                WALLACE & NORDAN  L.L.P.
                                                3737 Glenwood Ave., Suite 260
                                                Post Office Box 12065  (27605)
                                                Raleigh, North Carolina  27612
                                                Telephone: (919) 782-9322
                                                Facsimile: (919) 782-8113
                                                JRWallace@WallaceNordan.com