# EXHIBIT 2

No. _____

IN THE

# Supreme Court of the United States

OHIO DEMOCRATIC PARTY,

*Petitioner,*

v.

DONALD J. TRUMP FOR PRESIDENT, INC.,

*Respondent,*

OHIO REPUBLICAN PARTY, ROGER STONE, STOP THE
STEAL INC.,

*Defendants.*

**EMERGENCY APPLICATION TO VACATE SIXTH
CIRCUIT STAY OF TEMPORARY RESTRAINING
ORDER OR, IN THE ALTERNATIVE, PETITION
FOR WRIT OF CERTIORARI AND VACATUR, OR
INJUNCTION PENDING RESOLUTION**

**Directed to Honorable Elena Kagan, Associate
Justice of the Supreme Court of the United States
and Circuit Justice for the Sixth Circuit**

MARC E. ELIAS
*Counsel of Record*
BRUCE V. SPIVA
PERKINS COIE LLP

STEVEN KAUFMAN
KAUFMAN & COMPANY LLC
101 Lakeside Avenue
Suite 1710

700 13th Street, Suite 600
Washington, DC 20005
Telephone: (202) 434-1609
Fax: (202) 654-9126
melias@perkinscoie.com

MICHAEL J. GOTTLIEB
JESSICA PHILLIPS
GREG DUBINSKY
RYAN PARK
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com
jphillips@bsfllp.com
gdubinsky@bsfllp.com
rpark@bsfllp.com

DAWN SMALLS
LAURA HARRIS
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
dsmalls@bsfllp.com
lharris@bsfllp.com

Columbus, OH 44144
Telephone: (216) 912-5500
Fax: (216) 912-5501
steve.kaufman@kaufman-
company.com

DONALD MCTIGUE
MCTIGUE & COLOMBO LLC
545 East Town Street
Columbus, OH 43215
Telephone: (614) 263-7000
Fax: (614) 263-7078
dmctigue@electionlawgroup.com

N. ZACHARY WEST
OHIO DEMOCRATIC PARTY
340 East Fulton Street
Columbus, OH 43215
Telephone: (614) 221-6563
zwest@ohiodems.com
dmctigue@electionlawgroup.com

November 6, 2016

*Attorneys for Petitioner Ohio Democratic Party*

## STATEMENT PURSUANT TO SUPREME COURT RULE 29.6

Pursuant to Supreme Court Rule 29.6, the undersigned states that none of the Applicants has a parent corporation, and no publicly held corporation holds 10 percent or more of any Applicant's stock.

# TABLE OF CONTENTS

STATEMENT PURSUANT TO SUPREME COURT RULE 29.6 ...............................I

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES ........................................................................iii

EMERGENCY APPLICATION TO VACATE STAY....................................... 1

BACKGROUND.............................................................................................. 2

REASONS TO VACATE THE STAY ............................................................ 9

   I.   THE STAY ENTERED BY THE COURT OF APPEALS HAS NO BASIS IN
       LAW............................................................................................................ 9

    a.   The Court of Appeals Followed Inadequate Procedures Prior To Issuing
         Its Stay Of The TRO. ................................................................................. 9

    b.   The Appropriate Remedy, If Any, For Overbreadth Or Tailoring
         Inadequacies In The TRO Would Be To Vacate The Stay And Remand To
         The District Court..................................................................................... 13

   II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        GRANTING THE TRO .............................................................................. 14

CONCLUSION............................................................................................... 27

Case 1:16-cv-01288-CCE-JEP   Document 9-2   Filed 11/06/16   Page 5 of 37

# TABLE OF AUTHORITIES

**Cases**

*Ammlung* v. *City of Chester*, 494 F.2d. 811 (3d Cir. 1974).........................................21

*Applewhite* v. *Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988 (Pa. Commw. Ct. Jan. 17, 2014) ...................................................................17

*Baker* v. *Carr*, 369 U.S. 186 (1962) .........................................................13

*Brakebill* v. *Jaeger*, No. 16-civ-00008 (DLH), Dkt. No. 50 (D.N.D. Aug. 1, 2016).....17

*Bretz* v. *Kelman*, 773 F.2d 1026 (9th Cir. 1985) (en banc) .........................................20

*Burson* v. *Freeman*, 504 U.S. 191 (1992) .......................................................13, 15, 28

*Cameron* v. *Johnson*, 262 F. Supp. 873 (S.D. Miss. 1966) ........................................19

*Coleman* v. *Paccar,* 424 U.S. 1301 (1976) ....................................................10

*Cotz* v. *Mastroeni*, 476 F. Supp. 2d 332 (S.D.N.Y. 2007)............................................27

*Crawford* v. *Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007) .......................12

*Crawford* v. *Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ................................12, 18

*Crookston* v. *Johnson*, No. 16-2490, 2016 WL 6311623 (6th Cir. Oct. 28, 2016) 15, 16

*Dailey* v. *Hands*, No. 14-cv-423-KD-M, 2015 WL 1293188 (S.D. Ala. Feb. 20, 2015) ...................................................................................26, 27

*Davis* v. *Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322 (4th Cir. 1986) ...................................................................................25

*Democratic Nat'l Comm.* v. *Republican Nat'l Comm.*, 673 F.3d 192 (3d Cir. 2012). 26

*Democratic Nat'l Comm.* v. *Republican Nat'l Comm.*, 671 F. Supp. 2d 575 (D.N.J. 2009) ...................................................................................26

iii

*EEOC* v. *Wooster Brush Co. Employees Relief Association*, 727 F.2d 566 (6th Cir. 1984) .................................................................................................... 25

*Eu* v. *S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ................................. 28

*Frank* v. *Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014) ............................................. 18

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ......................................................... 18

*Guste* v. *Jackson*, 429 U.S. 399 (1977) .................................................................... 14

*Hooks* v. *Hooks*, 771 F.2d 935 (6th Cir. 1985) ......................................................... 21

*Jackson* v. *Riddell*, 476 F. Supp. 849 (N.D. Miss. 1979) .......................................... 19

*Keyes* v. *Sch. Dist. No. 1., Denver, Colo.*, 396 U.S. 1215 (1969) ............................... 13

*League of Women Voters of North Carolina* v. *North Carolina*, 769 F.3d 224 (4th Cir. 2014) ................................................................................................................ 18

*Lee* v. *Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181 (E.D. Va. May 19, 2016) ................................................................................................... 18

*Lucas* v. *Townsend*, 486 U.S. 1301 (1988) ............................................................... 13

Ohio Rev. Code §§3501.30(A)(4) .............................................................................. 14

Ohio Rev. Code. §3501.90(A)(1)(a) ........................................................................... 15

*One Wis. Inst.* v. *Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222 (W.D. Wis. July 29, 2016) ......................................................................................................... 17

*Perrin* v. *United States*, 444 U.S. 37 (1979) ............................................................. 19

*Purcell* v. *Gonzalez*, 549 U.S. 1 (2006) .............................................................. 10, 11

*Schenck* v. *Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997) .............................. 28

*Schmidt* v. *Lessard*, 414 U.S. 473 (1974) ................................................................ 14

*Swift & Co.* v. *United States*, 196 U.S. 375 (1905) .................................................... 24

*Turner* v. *Cooper*, 583 F. Supp. 1160 (N.D. Ill. 1983) ............................................... 27

Case 1:16-cv-01288-CCE-JEP   Document 9-2   Filed 11/06/16   Page 7 of 37

*United B'hd. of Carpenters & Joiners of Am., Local 610* v. *Scott*, 463 U.S. 825 (1983) ............................................................................................................... 20, 21

*United Food & Commercial Workers Local 1099* v. *City of Sidney*, 364 F.3d 738 (6th Cir. 2004) ........................................................................................................... 14

*United States* v. *Madden*, 403 F.3d 347 (6th Cir. 2005) ............................................. 15

*United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012) ...................................... 19, 26

*United States* v. *Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ............... 26

*Veasey* v. *Abbott*, 830 F.3d 216 (5th Cir. 2016) .......................................................... 17

*Western Airlines, Inc.* v. *Int'l Bd. of Teamsters*, 480 U.S. 1301 (1987) ...................... 11

*Whatley v. Vidalia*, 399 F.2d 521 (5th Cir. 1968) ...................................................... 19

*Williams* v. *Rhodes*, 393 U.S. 23 (1968) ...................................................................... 12

*Yick Wo* v. *Hopkins*, 118 U.S. 356 (1886) ................................................................... 13

**Statutes**

42 U.S.C. §1985 ......................................................................................................... 2, 20

52 U.S.C. §10307 ....................................................................................................... 2, 19

Ohio Rev. Code §3501.30 ............................................................................................. 8

Ohio Rev. Code §3501.35 .......................................................................................... 8, 14

Ohio Rev. Code §3501.90 .......................................................................................... 8, 15

Ohio Rev. Code §3599.24 .......................................................................................... 8, 14

**Rules**

Fed. R. App. P. 27 ......................................................................................................... 12

Fed. R. App. P. 8 ........................................................................................................... 12

Fed. R. Civ. P. 65(d) ..................................................................................................... 24

v

# Emergency Application to Vacate Stay

To the Honorable Elena Kagan, Associate Justice of the Supreme Court of the United States and Circuit Justice for the Sixth Circuit:

Applicant respectfully requests that this Court vacate the order issued by the Court of Appeals for the Sixth Circuit on November 6, 2016, staying a temporary restraining order ("TRO") issued by the U.S. District Court for the Northern District of Ohio on November 4, 2016, that enjoined Donald J. Trump for President, Inc. ("the Trump Campaign") and associated persons from engaging in activities that would otherwise have the effect of intimidating, harassing, or coercing voters. The Sixth Circuit ordered the stay notwithstanding that it did not call for or receive a substantive response brief from Applicant and, by its own admission, had not yet reviewed the critical evidence on which the District Court relied.

This extraordinary departure from the most basic requirements of appellate procedure led the Sixth Circuit to issue a cursory order with no basis in law. A Court of Appeals cannot conclude that a lower court has abused its discretion without first reviewing and considering the actual *evidence* on which the lower court's decision was based. Yet the Sixth Circuit somehow found that the District Court had abused its discretion before it had even received the transcript of the evidentiary hearing, at which live witnesses presented testimony that informed the District Court's decision. Crucially, that decision was stayed even though it required compliance with specific, clear, and unchallenged provisions of Ohio election law. If left in place, the Court of Appeals' stay will, in the words of the

1

Republican Director of the Cuyahoga County Board of Elections, put the "safety and well-being" of Ohio voters at risk from Trump-encouraged and unauthorized "watchdogs" at the polls. 415A. The Court of Appeals' unprecedented stay should be vacated without delay.

## Background

Judge Gwin of the U.S. District Court for the Northern District of Ohio, after examining a wide variety of evidence submitted by the parties, including live witness testimony, determined that Petitioner Ohio Democratic Party ("the Democratic Party") is likely to prevail on the merits of its claim that Respondent Trump Campaign is conspiring to deprive minority voters of their right to vote free from intimidation and harassment. *See* 42 U.S.C. §1985(3) (Ku Klux Klan Act of 1871); 52 U.S.C. §10307(b) (Section 11(b) of the Voting Rights Act). That decision was fully consistent with governing Supreme Court and Sixth Circuit precedent. The documentary and testimonial evidence in the record was more than adequate to support the TRO entered by the District Court.

Over the past several months, Donald J. Trump has warned that the 2016 election will be stolen from him unless supporters in Ohio and elsewhere swarm urban communities and "watch," "[a]nd when [I] say 'watch,' you know what I'm talking about, right?" 312A. Trump has said "[t]he only way we can lose . . . and I really mean this . . . is if cheating goes on." 312A.

Accordingly, the Trump Campaign has hosted a form on its website for supporters to sign up to be "Trump Election Observers" in order to "Stop Crooked

2

Hillary From Rigging This Election!" 174A. ("Volunteer to be a Trump Election Observer"), further encouraging his supporters to join in a common plan to "watch" voters in "certain areas" of states like Ohio for voter fraud. The Trump Campaign provided the Ohio Republican Party with about 200 to 300 names for poll observers. 762A.[1]

The record evidence shows that Trump's call to action has resulted in concrete actions in Ohio likely to result in voter intimidation. For example, the record contained evidence that Trump supporters have already appeared at elections board offices in Cuyahoga County (where Cleveland is located) and identified themselves as poll observers, despite not being appointed as required by Ohio law. Another Trump supporter in Ohio announced his intention to go "watch" as "Trump said," which he understood to involve "racial profiling" of "Mexicans," "Syrians," and those "who can't speak American": "I'm going to go right up behind them. . . . I'm going to make them a little bit nervous." 199A. Yet another Ohio supporter announced his intention to leave his rural county to engage in unauthorized poll-watching in the county containing Columbus, Ohio because "[f]raud's more likely up there." 440A.

Those developments have caused deep concern among Ohio state officials responsible for ensuring the integrity of the 2016 election. Pat McDonald, the Republican director of the Cuyahoga County Board of Elections, observed that

---

[1] Citations are to the rough draft of the hearing transcript because the final version was unavailable until shortly before filing. With the Court's leave, we will file a corrected version of the application as soon as possible.

Trump "is basically telling his supporters to be watchdogs of the polling locations," and stated that he is "concerned" about "the safety and well-being of . . . the voters." McDonald has "never" seen "rhetoric" like that coming from Trump—rhetoric that concerns him there will be instability at the polls. He is in touch with law enforcement in an attempt to prepare for Trump supporters acting on their candidate's call for voter intimidation. 414A-415A.

Despite Trump's repeated claims that aggressive poll monitoring is necessary to prevent the election from being stolen from him, the Republican Secretary of State of Ohio has denied voter fraud will affect the election, and the Executive Director of the Ohio Republican Party testified before the District Court she had no personal knowledge of any voter fraud. 763A.

In addition, counsel for the Ohio Republican Party conceded it had no evidence of voter fraud, and counsel stated she was "not aware of *any*" documented voter fraud in the last five years or, for that matter, "in the last few weeks when we've had early voting." 711A (emphasis added). Even counsel for the Trump Campaign—when asked as an "officer of the court"—conceded that it is "less likely" that fraud could determine a presidential election. 721A-722A.

The District Court found, on the record before it, that there was no plausible factual basis to expect significant voter fraud, let alone the massive fraud Trump claims will cause the election to be stolen from him. 779A-787A.

The District Court further found that the lack of concrete evidence of widespread voter fraud, let alone vote "rigging," revealed a pretextual justification

designed to facilitate voter suppression in urban areas. In light of the complete absence of voter fraud, Trump's claims appear to be "all code words . . . really an incitement to harass [D]emocratic leaning but more specifically African-American or Hispanic voters." 722A. Rejecting the argument by counsel for the Trump Campaign that Trump's claim the election will be stolen from him without aggressive poll monitoring was simply an attempt to encourage Trump supporters to vote, Judge Gwin explained:

> "If you had a chance to go to the Indians game and somebody [c]ame to you and said it's already been fixed, the umpires have already decided to give it to Chicago, is it more likely that you're going to go to the game or less likely? . . . I would think it's less likely. . . . And I don't think it's plausible to say more likely."[2] 784A.

The District Court concluded there was no plausible reason for Trump to claim widespread voter fraud other than "to incite people to come out and impede the election." 728A. Trump's call (issued in Ohio) for his supporters to "watch," "[a]nd when [I] say 'watch,' you know what I'm talking about, right?" is part of the Campaign's attempt "to stir people up to intimidate voters." 785A.

Meanwhile, Ohio State Representative Stephanie Howse testified before the District Court that the activities encouraged by Trump are likely to intimidate voters and suppress turnout. She explained the intimidating effect of a billboard, describing voter fraud as illegal and warning about imprisonment, placed in an "overwhelmingly African American" neighborhood in her district during the 2012

---

[2] The rough transcript inaccurately attributes that last statement ("And I don't think it's plausible to say more likely") to counsel for the Trump Campaign. The Judge made that particular comment.

election cycle. 742A. Representative Howse testified that the billboard made her constituents "very hesitant to actually vote." 743A. If there were literature distributed at polling places "saying voter fraud is a crime or purporting to define voter fraud," voters would be confused and "very hesitant." 746A.

Similarly, if Trump supporters seek to make minority voters "a little bit nervous" by "go[ing] right up behind them" (as one supporter has said he will do), minority voters would experience "hesitation" and nervousness, and there would be "unnecessary confrontation." 745A-746A. And if voters and their vehicles were recorded going in and out of polling places, that would be very "upsetting to the voters." 746A-747A.

Moreover, Representative Howse testified that even a small number of events involving suppression or intimidation could have a disproportionately large effect on voter turnout, because voters "would post about it on social media," and the result would be that "[i]t would definitely hinder people's ability, the people that already hesitant in this election cycle to exercise their right to vote." 746A.

Representative Howse also testified that she and her constituents interpret Trump's exhortations for his mostly white supporters to "watch" urban areas as a direction "[t]o go to the black communities." Based on her knowledge of her district, Representative Howse testified that minority voters there would similarly interpret those statements as a direction to "[g]o look at the black community, come to our communities." 744A.

In light of the evidence in the record, the District Court entered a tailored injunction requiring compliance with Ohio's established election procedures. The District Court explained:

> "[T]he Court orders compliance with specific provisions of the Ohio Revised Code until voting concludes for the 2016 Presidential Election. And, where there is a legitimate possibility that particular laws may be imminently violated, ordering compliance with those laws is appropriate." 44A.

The TRO provides, as relevant, that the Trump Campaign and associated persons are "enjoined from engaging in voter intimidation activity," which includes:

> "a. Hindering or delaying a voter or prospective voter from reaching or leaving the polling place fixed for casting the voter's ballot;
>
> b. Engaging in any unauthorized 'poll watching' activities inside of polling places, within one hundred feet of polling places ('the buffer zone'), or within ten feet of a voter standing in a line extending beyond the buffer zone. Unauthorized 'poll watching' includes challenging or questioning voters or prospective voters about their eligibility to vote, or training, organizing, or directing others to do the same;
>
> c. Interrogating, admonishing, interfering with, or verbally harassing voters or prospective voters inside polling places, in the buffer zone, or within ten feet of a voter standing in line outside the buffer zone, or training, organizing, or directing others to do the same;
>
> d. Distributing literature and/or stating to individuals at polling places, in the buffer zone, or within ten feet of a voter standing in line outside the buffer zone, that voter fraud is a crime, or describing the penalties under any Ohio or Federal statute for impermissibly casting a ballot, or training, organizing, or directing individuals to do the same;
>
> e. Gathering or loitering, or otherwise being present without the intention to vote, at polling places, in the buffer zone, or within ten feet of a voter standing in line outside the buffer zone;
>
> f. Following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles at or around a polling place, or training, organizing, or directing others to do the same;

7

g. Questioning, and training, organizing, or deputizing any persons to question voters at Ohio polling places, in the buffer zone, or within ten feet of a voter standing in line outside the buffer zone, under the guise of the purported 'exit polling' or 'citizen journalist' operations organized and encouraged by Defendants Stone and Stop the Steal." 44A-46A.

The TRO orders compliance with specific Ohio statutory provisions, the constitutionality of which has not been challenged in this litigation. *See* Ohio Rev. Code §§3501.30(A)(4) (no electioneering, loitering, or congregating within 100-foot buffer zone around polls), 3501.35(A)(1) (same prohibition within buffer zone or within ten-foot bubble around any voter waiting in line if line extends beyond the 100-foot buffer), 3501.35(A)(2) (no "hinder[ing] or delay[ing]" a voter "in reaching or leaving" polling places); 3501.90(A)(1)(a) (no "harassment," which includes any "practice or attempt tending to obstruct, intimidate, or interfere" with a voter); 3599.24(A)(5) (no loitering "in or about" a polling place "so as to hinder, delay, or interfere" with the voting process).

Critically, the District Court also noted: "This Order does not apply to any activity explicitly authorized by Ohio law with respect to poll observers officially credentialed by a board of elections to be present at the polling place or the right under Ohio law for others to enter a polling place solely for purposes of reviewing the list of voters." 46A. The TRO does not prevent the Ohio Republican Party from following the normal procedures under Ohio law allowing appropriately authorized, party-endorsed poll observers to be present at polling places.

That same day, the Trump Campaign filed a motion to stay the District Court's TRO and a motion for initial hearing *en banc*. 630A-634A. The Trump Campaign's motion to stay was over 30 pages—accompanied by a motion for an

8

extension of the page limit—and the motion for initial hearing *en banc* was 11 pages and incorporated the arguments from the motion to stay. The following day, November 5, 2016, the Sixth Circuit requested a 10-page submission from the Ohio Democratic Party responding to the Trump Campaign's motion for initial hearing *en banc*, which Applicant filed as directed. On November 6, 2016, without any notice to the Ohio Democratic Party, the Sixth Circuit issued a 2-page order summarily staying the District Court's TRO "[a]fter reviewing the district court's order, the motion for an emergency stay of that order, and the Plaintiff's submission in response to the Petition for Initial En Banc Hearing." 689A. The Court of Appeals provided no notice to Applicant that it would be considering the stay request on the merits, and offered no opportunity for Applicant to submit a brief, or present oral argument, on the request. After it stayed the TRO, the Court of Appeals denied the Trump Campaign's request for initial hearing *en banc*.

This application for vacatur of the stay issued by the Sixth Circuit followed.

## Reasons to Vacate the Stay

### I. THE STAY ENTERED BY THE COURT OF APPEALS HAS NO BASIS IN LAW

#### a. The Court of Appeals Followed Inadequate Procedures Prior To Issuing Its Stay Of The TRO.

The Sixth Circuit, by its own admission, reviewed none of the evidence before the District Court before it issued its extraordinary order. Moreover, it did not request any opposition to the motion for stay. See 689A. (the Sixth Circuit "review[ed] the district court's order, the [Trump Campaign's] motion for an

9

emergency stay of that order, and [the Ohio Democratic Party's] submission in response to the Petition for Initial En Banc Hearing"). In so doing, the Sixth Circuit opened the floodgates for Trump supporters to act on the Campaign's concerted plans to intimidate voters on Election Day—a threat a top Ohio elections official believes could well result in greater instability at the polls. See *Purcell* v. *Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequence incentive to remain away from the polls.").

"[I]f the record convincingly demonstrates that the Court of Appeals could not have considered" the factors of irreparable harm and probable success on the merits and "the effect of its decision is shown to pose a danger of irreparable harm impairing this Court's ability to provide full relief in the event it ultimately reviews the action of the Court of Appeals on the merits," the Court "should afford the interim relief sought." *Coleman* v. *Paccar,* 424 U.S. 1301 (1976) (Rehnquist, J., in chambers); see *Western Airlines, Inc.* v. *Int'l Bd. of Teamsters*, 480 U.S. 1301, 1305 (1987) (O'Connor, J., in chambers) (a "Circuit Justice has jurisdiction to vacate a stay where it appears that the rights of the parties to a case pending in the court of appeals . . . may be seriously and irreparably injured by the stay, and the Circuit Justice is of the opinion that the court of appeals is demonstrably wrong in its application of accepted standards in deciding the issue of the stay") (citation omitted).

That standard is met here for several reasons. First and foremost, the Sixth Circuit admittedly "could not have considered" the relevant factors in determining whether a TRO should be stayed because it did not review the record evidence. As in *Purcell*, there is "no indication that" the Sixth Circuit gave "deference to the discretion of the District Court," as it was required to do. *Id.* at 5. "[B]y failing to provide any factual findings or indeed any reasoning of its own the Court of Appeals [leaves] this Court in the position of evaluating the Court of Appeals' bare order in light of the District Court's ultimate findings." *Id.* Because "[t]here has been no explanation given by the Court of Appeals showing the ruling and findings of the District Court to be incorrect," this Court should vacate the stay and reinstate the District Court's Order. *Id.*

The Sixth Circuit also flouted its own established procedure by failing to provide an opportunity for the non-movant to respond, which is highly disturbing in the context of a forcefully contested lawsuit about a concerted attempt at voter intimidation on the eve of the presidential election. Federal Rule of Appellate Procedure 27 provides that "[a]ny party may file a response to a motion" "within 10 days after service of the motion," and "[a] motion" to stay an "order of a district court pending appeal" "may be granted before the 10-day period only if the court gives reasonable notice to the parties that it intends to act sooner." Fed. R. App. P. 27(a)(3)(A); see Fed. R. App. P. 8. Nothing in the Sixth Circuit's local rules alters those requirements. Yet the Sixth Circuit gave absolutely no notice to the Ohio

11

Democratic Party that it intended to grant the Trump Campaign's motion before considering a response.

The Sixth Circuit's stay will cause irreparable harm to the Ohio Democratic Party, its candidates, and most importantly thousands of voters who are exposed to intimidation, harassment, and coercion from Trump-incited illegal "watchdogs" at the polls. The Ohio Democratic Party brought this litigation to vindicate the constitutional rights of voters to exercise the franchise free from intimidation. See, e.g., *Crawford* v. *Marion Cty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008) (citing *Crawford* v. *Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law.")).

The right to vote is a fundamental right whose deprivation constitutes an irreparable injury. Indeed, the constitutional interest at stake in this litigation is the voters' "most precious" "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams* v. *Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson* v. *Freeman*, 504 U.S. 191, 199 (1992) (plurality), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886). The Constitution secures the "citizen's right to a vote free of arbitrary impairment by state action," including intimidation by self-appointed poll-watcher vigilantes. *Baker* v. *Carr*, 369 U.S. 186, 208 (1962).

12

The Sixth Circuit's disregard for the Federal Rules of Appellate Procedure in its rush to stay the District Court's TRO, as well as its failure to review the record evidence, are highly prejudicial to Applicant. Further, such a rush to judgment, undermines public confidence in the Judiciary's ability to operate regularly during times of heightened national attention when there is a commensurately heightened need for judicial solicitude for core constitutional rights. See *Keyes* v. *Sch. Dist. No. 1., Denver, Colo.*, 396 U.S. 1215, 1215-16 (1969) ("Where a preliminary injunction has issued to vindicate constitutional rights, the presumption in favor of the District Court's action applies with particular force."); see also *Lucas* v. *Townsend*, 486 U.S. 1301, 1305 (1988) (KENNEDY, J., in chambers) (granting injunction enjoining a bond referendum election because "[p]ermitting the election to go forward [without statutory protection] would place the burdens of inertia and litigation delay on those whom the statute was intended to protect").

### b. The Appropriate Remedy, If Any, For Overbreadth Or Tailoring Inadequacies In The TRO Would Be To Vacate The Stay And Remand To The District Court.

With the benefit of extensive briefing and an evidentiary hearing, the District Court entered a TRO that was tailored to the threats to the integrity of the electoral process. The appropriate remedy for any overbreadth or tailoring inadequacies is to remand to the District Court, which has the benefit of the full record before it. See *Schmidt* v. *Lessard*, 414 U.S. 473, 477 (1974) (remanding to district court to determine "precise bounds" of injunction); see also *Guste* v. *Jackson*, 429 U.S. 399, 399 (1977) (remanding to district court for further consideration of injunction's scope). By entering a stay, however, the Court of Appeals deprived the District

13

Court of jurisdiction to consider modifications to its order, or to address emergency issues that may arise in the coming days.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE TRO

Separate and apart from the Sixth Circuit's procedural improprieties, the District Court's TRO is appropriately tailored to match the variety of evidence in the record indicating that voter intimidation and disruption is likely on Election Day.

First, the TRO indisputably prohibits conduct that is not protected speech. It bars "hinder[ing] or delay[ing] a voter or prospective voter from reaching or leaving the polling place" and orders compliance with the unchallenged Ohio laws creating a 100-foot buffer zone free from electioneering and unauthorized poll observing activities, as well as Ohio's similar proscriptions applicable to ten-foot bubbles around voters standing in a polling-place line extending beyond the buffer zone. See Ohio Rev. Code §§3501.30(A)(4), 3501.35(A)(2), 3599.24; see also *United Food & Commercial Workers Local 1099* v. *City of Sidney*, 364 F.3d 738, 748 (6th Cir. 2004) ("[A] state may require persons soliciting signatures to stand 100 feet from the entrances to polling places without running afoul of the Constitution.").

Similarly, Ohio law proscribes loitering at a polling location "so as to hinder, delay, or interfere with the conduct of the registration or election," id. §3599.24(A)(5), and "harassment," which includes any "practice or attempt tending to obstruct, intimidate, or interfere with an elector . . . in voting," id. §3501.90(A)(1)(a).

14

Indeed, the fact that the TRO is precisely tailored to require adherence with Ohio law, while giving specific examples of proscribed conduct, illustrates why the Campaign has no substantial interest or protected right in the conduct that the TRO enjoins. The TRO is justified under the State's "compelling interest in protecting the right of [United States] citizens to vote freely for the candidates of their choice." *Burson*, 504 U.S. at 198 (upholding polling-place buffer zone). "[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States* v. *Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part).

The TRO's proscription on "[f]ollowing, taking photos of, or otherwise recording" voters or "their vehicles at or around a polling place" is similarly justifiable, and in any event is warranted in light of the evidence. As an initial matter, that proscription is likely encompassed by Ohio's bar on harassment and intimidation. Ohio Rev. Code. §3501.90(A)(1)(a). More importantly, the Sixth Circuit has just upheld Michigan's ban on photography of marked ballots, partly because it "advances [the] serious governmental interes[t] . . . [of] preventing voter intimidation." *Crookston* v. *Johnson*, No. 16-2490, 2016 WL 6311623, at *3 (6th Cir. Oct. 28, 2016) (upholding ban on ballot selfies as "content-neutral regulation that reasonably protects voters' privacy"). "[P]osing for a ballot selfie could compromise the secrecy of another's ballot [and] distract other voters." *Id.* at *2. The Court likewise rejected the "argument that [there is] no evidence of ballot photography

15

being used . . . to intimidate voters," and concluded that any "expressive rights" in such conduct are "outweigh[ed]" by "the privacy interests of other voters." *Id.* at 3.

In any event, that portion of the TRO—and the entirety of the TRO—is justified by the strength of the evidence, which is compelling. Trump has exhorted supporters in Ohio and elsewhere to swarm majority-minority communities and "watch," "[a]nd when [I] say 'watch,' you know what I'm talking about, right?" In response, Trump supporters have appeared at elections board offices and identified themselves as poll observers, despite not being appointed as such pursuant to Ohio law. Pat McDonald, the Republican director of the Cuyahoga County Board of Elections, explained that Trump "is basically telling his supporters to be watchdogs of the polling locations," and that he is "concerned" about "the safety and well-being of . . . the voters." As Judge Gwin observed at the hearing: "It's been kind of a central cornerstone of [the Trump] campaign that there's this huge voter fraud which is kind of either a suggestion that he is afraid he's going to lose and wants an excuse or suggestion that the way to win is to somehow stop the vote by repressing voter turn out." Hearing Trans. at 31: 20-25.

Trump has no factual basis for his claims of voter fraud, as Judge Gwin found at the hearing and as Ohio's Republican Secretary of State Jon Husted has plainly acknowledged. Indeed, Husted rejected the notion of widespread in-state voter fraud, saying there is "no evidence" of widespread voter fraud in Ohio, and that "there are no facts that support" Trump's claims to the contrary. 427A. Moreover, both the Executive Director for the Ohio Republican Party and the Party's counsel

represented to the District Court that they had no knowledge of *any* voter fraud. 763A. Even counsel for the Trump Campaign—when asked as an "officer of the court"—acknowledged that it was "less likely" that voter fraud would affect the presidential election. 721A-722A.

It is therefore unsurprising that the courts that have examined the evidence have concluded that widespread voter fraud does not exist. In a challenge to Pennsylvania's voter ID law, for example, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere. *Applewhite* v. *Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014). A federal judge in North Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent." *Brakebill* v. *Jaeger*, No. 16-civ-00008 (DLH), Dkt. No. 50 (Aug. 1, 2016). A federal judge in Wisconsin has similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities." *One Wis. Inst.* v. *Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016); see also *Veasey* v. *Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature was that in- person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage.");

17

*League of Women Voters of North Carolina* v. *North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Crawford*, 553 U.S. at 194 ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history."); *Frank* v. *Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014) ("[I]t appears that there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Lee* v. *Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

As the District Court explained, the lack of evidence of voter fraud "suggests that this is all code words, that [Trump's rhetoric is] really an incitement to harass [D]emocratic leaning but more specifically African-American or Hispanic voters." 722A. The District Court concluded there was no reason for Trump to make unsubstantiated claims of voter fraud other than "to incite people to come out and impede the election." 728A.

Finally, the Campaign is not likely to prevail in its challenge to the Democratic Party's showing that the Campaign has or will violate Section 11(b) of the Voting Rights Act and the Ku Klux Klan Act of 1871. Section 11(b) directs that no "[n]o person, whether acting under color of law or otherwise, shall intimidate,

18

threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. §10307(b). The statutory terms cover not only the most powerful levers of the state, such as "arrest and prosecution," *see Cameron* v. *Johnson*, 262 F. Supp. 873, 897 (S.D. Miss. 1966), but also plainly apply to threatening, intimidating, and coercive acts carried out by private individuals. Section 11(b) "on its face prohibits any intimidation, threat, or coercion, whether done by a public official or by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968). Moreover, the undefined statutory terms should be given their "ordinary, contemporary, common meaning." *Perrin* v. *United States*, 444 U.S. 37, 42 (1979); see *Jackson* v. *Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (Section 11(b) "is to be given an expansive meaning").

For instance, the Ninth Circuit found that it constituted "intimidation" to send a mass mailing to 14,000 newly registered voters with Hispanic surnames warning them that if they voted in the election, their personal information would be collected and made available to organizations that were "against immigration." *United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (interpreting a criminal voter intimidation provision of the California election code). As the Ninth Circuit held, "intimidation" is "not limited to displays or applications of force, but can be achieved through manipulation and suggestion," including "through subtle, rather than forcefully coercive means." *Id.* (emphasis added).

The above evidence, taken together, demonstrates that the Trump Campaign cannot show it is likely to prevail against the Democratic Party's claim that the

19

Campaign has violated the Ku Klux Klan Act of 1871. The relevant provision of the Klan Act, codified at 42 U.S.C. §1985(3), creates liability for three different kinds of conspiracies. See *United B'hd. of Carpenters & Joiners of Am., Local 610* v. *Scott*, 463 U.S. 825, 839 n.1 (1983) (Blackmun, J., dissenting); *Bretz* v. *Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc). The Ohio Democratic Party's claim arises under §1985(3)'s provision barring conspiracies to suppress voters, which provides: "[I]f two or more persons conspire to prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy," and "one or more persons engaged" in that conspiracy commit an act in furtherance of the conspiracy that injures a person or deprives that person of a federal right, "the party so injured or deprived may have an action . . . ." 42 U.S.C. §1985(3).

The Ninth Circuit has referred to this type of a §1985(3) conspiracy as "a conspiracy to interfere with federal elections." *Bretz*, 773 F.2d at 1027 n.3. A straightforward reading of the statutory text, coupled with case law interpreting other Klan Act claims, makes clear that the Ohio Democratic Party's claim is likely to succeed.

In construing §1985(3) conspiracy claims, this Court has explained that:

> to make out a violation of § 1985(3), as construed in *Griffin* v. *Breckenridge* [which construed the section's first clause], the plaintiff must allege and

prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United B'hd. of Carpenters*, 463 U.S. at 828-29. It follows that to make out a violation of the latter part of §1985(3) at issue here, a plaintiff must allege and prove the following four elements: (1) a conspiracy; (2) to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

First, the Ohio Democratic Party is likely to succeed on the merits of its claim that the Trump Campaign have engaged in a conspiracy. "A civil conspiracy is combination of two or more persons to an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Ammlung* v. *City of Chester*, 494 F.2d. 811, 814 (3d Cir. 1974). As the Sixth Circuit has elaborated,

> [a] civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks* v. *Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).

Plaintiff has alleged facts likely to prove that the Trump Campaign—along with Defendants Roger Stone and Stop the Steal Inc.—have agreed, tacitly and

21

explicitly, to a "single plan" to suppress voting by Democratic, and predominantly non-white, voters in the 2016 Election, and that each individual Defendant shares in the "general conspiratorial objective."

A "senior official" at the Trump Campaign recently admitted to Bloomberg Businessweek that the Campaign is engaged in "major voter suppression operations" designed to prevent minority and Democratic-leaning voters from casting lawful ballots. 292A-308A. Trump has repeatedly warned his followers that the election will be "rigged," and exhorted his followers to monitor other voters. 311A-325A. The Boston Globe has reported on Trump supporters who are planning to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest: "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio.

> "I'll look for . . . well, it's called racial profiling. Mexicans. Syrians. People who can't speak American," he said. "I'm going to go right up behind them. I'll do everything legally. I want to see if they are accountable. I'm not going to do anything illegal. I'm going to make them a little bit nervous."

192A-204A.

Similarly, Stone and his organization Stop the Steal Inc. have amplified Trump's recruiting call, by signing up Trump supporters to "volunteer" to fight "voter fraud," spreading false claims and encouraging his audience to engage in unlawful voter intimidation, and encouraging "exit pollers" to intimidate minority voters. 176A-178A. These efforts have the backing of the ORP and RNC. 207A-213A.

Second, Plaintiffs will likely prove that the conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat." For the reasons laid out above, the Trump Campaign's efforts are plainly designed to threaten, coerce, and intimidate Democratic and minority voters, and to encourage Trump's supporters to engage in activities outside of the ordinary election procedures established by Ohio law.

Third, each co-conspirator has performed an act in furtherance of that conspiracy. See 165A-167A; 179A-191A; 216A-219A; 292A-308A. Each of these acts, and many others, has furthered the conspiracy to prevent lawful voters from voting, by intimidation.

Finally, each of those acts has injured the Ohio Democratic Party, both by harming its prospects in the upcoming election, and by depriving the lawful voters whose interests it represents of their legal right to vote in that election free of intimidation. Without immediate relief, Ohio voters will face the deprivation of their right to vote on account of the co-conspirators' intimidation.

The District Court's Order was also appropriate under Federal Rule of Civil Procedure 65(d). Consistent with that rule, the TRO carefully enumerates the conduct it prohibits. Fed. R. Civ. P. 65(d) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required."). The Trump Campaign and its agents therefore were "informed, as accurately as the case permits, what they are forbidden to do." *Swift & Co.* v. *United States*, 196 U.S. 375, 401 (1905).

23

The TRO is a stark contrast to the broad prohibitions that fall short of Rule 65's requirements. See, e.g., *EEOC* v. *Wooster Brush Co. Employees Relief Association*, 727 F.2d 566 (6th Cir. 1984) (enjoining defendants "from discriminating against women on the basis of their gender"); *Davis* v. *Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322, 1328 (4th Cir. 1986) (vacating a paragraph of an injunction that directs the enjoined party to "obey the statute"). In contrast to those vague and indefinite injunctions, the TRO here provides that "rather than issue a broad and indefinite injunctive order, the Court orders compliance with specific provisions of the Ohio Revised Code until voting concludes for the 2016 Presidential Election." 44A.

The TRO does not merely command the Trump Campaign to abide by the terms of Section 11(b) of the Voting Rights Act and the Ku Klux Klan Act of 1871, or enjoin the Campaign from merely "intimidating" voters. Instead, it proscribes specifically enumerated voter intimidation tactics, including "hindering or delaying a voter or prospective voter from reaching or leaving the polling place," "[i]nterrogating, admonishing, interfering with, or verbally harassing voters or prospective voters inside polling places, in the buffer zone, or within ten feet of a voter standing in line outside the buffer zone, or training, organizing, or directing others to do the same," and engaging in "unauthorized poll watching activities inside of polling places" or within the defined buffer zone, which the Court defined to include "challenging or questioning voters or prospective voters about their eligibility to vote, or training, organizing, or directing others to do the same." 45A.

24

Those proscriptions do not "abstractly enjoin" the Trump Campaign; instead, they identify specific areas of concern on the basis of a full factual record. *United States* v. *Philip Morris USA Inc.*, 566 F.3d 1095, 1137-38 (D.C. Cir. 2009) (affirming injunction that did not "abstractly enjoin Defendants from violating RICO or making false statements, but instead specified the matters about which Defendants are to avoid making false statements or committing racketeering acts: the manufacturing, marketing, promotion, health consequences, and sale of cigarettes, along with related issues that Defendants have reason to know are of concern to cigarette consumers"). "[W]here there is a legitimate possibility that particular laws may be imminently violated, ordering compliance with those laws is appropriate." 44A.

Nor do prohibitions against voter intimidation such as the TRO entered by the District Court "run[] afoul of the First Amendment." *Tan Duc Nguyen*, 673 F.3d at 1266. As an initial matter, the Campaign cannot rely on the First Amendment for permission to intimidate and harass voters under the guise of poll-watching, because "poll watching is not a fundamental right which enjoys First Amendment protection." *Dailey* v. *Hands*, No. 14-cv-423-KD-M, 2015 WL 1293188, at *4 (S.D. Ala. Feb. 20, 2015), report and recommendation adopted, Mar. 23, 2015; see *Democratic Nat'l Comm.* v. *Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 596 (D.N.J. 2009) (rejecting as "meritless" the argument that consent decree bar on RNC "ballot security activities" "infringes on activity protected by the First Amendment"), *aff'd*, 673 F.3d 192 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013);

25

*Cotz* v. *Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching . . . has no distinct First Amendment protection"); *Turner* v. *Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("no authority" for "the proposition that" a person has "a first amendment right to act as a pollwatcher"). The "position of poll-watcher," rather, is "a mere creature of state statute." *Cotz*, 476 F. Supp. 2d at 364; see *Dailey*, 2015 WL 1293188, at *5 (rejecting the argument that "poll watching is actually a First Amendment right that 'transcends' merely serving as a poll watcher").

Even if the TRO abridges some protected speech, which the Ohio Democratic Party disputes, the order is properly tailored to withstand First Amendment scrutiny. Contrary to what the Trump Campaign suggests, the TRO is not content-based. The TRO provisions enjoin individuals from, inter alia, "[h]indering or delaying a voter or prospective voter"; "[e]ngaging in any unauthorized 'poll watching' activities"; "[i]nterrogating, admonishing, interfering with, or verbally harassing voters or prospective voters"; and "following, taking photos of, or otherwise recording voters." These provisions do not turn on the content or viewpoint of any individual message. Read as a whole, the TRO is a content-neutral prohibition against voter intimidation or threat, as the District Court explained. See *Schenck* v. *Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 364 n.1 (1997) (acknowledging narrow construction of a TRO provision by the courts below).

Because the TRO is content-neutral, the *Schenck* test applies. This Court must determine "whether the challenged provisions . . . [1] burden no more speech than necessary [2] to serve a significant government interest." *Id.* at 372. The TRO

26

complies with both elements. The Supreme Court repeatedly has held that preventing voter intimidation and coercion is a compelling interest. *See, e.g., Burson*, 504 U.S. at 198; *Eu* v. *S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989). And, as stated above, the TRO is tailored precisely to match the evidence in the record of the plans by the Campaign and its supporters to disrupt the voting process and intimidate voters. *See supra* Section I.A.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Sixth Circuit's November 6, 2016 stay of the TRO issued by the U.S. District Court for the Northern District of Ohio on November 4, 2016.

In the alternative, Applicant respectfully requests the Court to grant a writ of certiorari and to vacate and remand, or grant injunctive relief pending disposition of the petition.

Dated: November 6, 2016                    Respectfully submitted,


                                           /s/ Marc Elias

                                           Marc E. Elias
                                           *Counsel of Record*
                                           Bruce V. Spiva
                                           Perkins Coie LLP
                                           700 13th Street, Suite 600
                                           Washington, DC 20005
                                           Telephone: (202) 434-1609
                                           Fax: (202) 654-9126
                                           melias@perkinscoie.com

                                           Michael J. Gottlieb
                                           Jessica Phillips

Greg Dubinsky
Ryan Park
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, NW
Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com
jphillips@bsfllp.com
gdubinsky@bsfllp.com
rpark@bsfllp.com

Dawn Smalls
Laura Harris
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
dsmalls@bsfllp.com
lharris@bsfllp.com

Steven Kaufman
Kaufman & Company LLC
101 Lakeside Avenue, Suite 1710
Columbus, OH 44144
Telephone: (216) 912-5500
Fax: (216) 912-5501
steve.kaufman@kaufman-company.com

Donald McTigue
McTigue & Colombo LLC
545 East Town Street
Columbus, OH 43215
Telephone: (614) 263-7000
Fax: (614) 263-7078
dmctigue@electionlawgroup.com

N. Zachary West
Ohio Democratic Party
340 East Fulton Street
Columbus, OH 43215
Telephone: (614) 221-6563

28

zwest@ohiodems.com
dmctigue@electionlawgroup.com

*Counsel for Ohio Democratic Party*

29