IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA DEMOCRATIC PARTY,      :<br>              Plaintiff,               :<br>         v.                                       :<br>                                                       :<br>REPUBLICAN PARTY OF                     :<br>PENNSYLVANIA; DONALD J. TRUMP  :<br>FOR PRESIDENT, INC.; ROGER J.        :<br>STONE, JR.; and STOP THE STEAL INC., :<br>              Defendants.             :<br>                                                       : | Civ. No. 16-5664 |

**Diamond, J.**                                                                                        November 7, 2016

## M E M O R A N D U M

On October 30, 2016, the Pennsylvania Democratic Party filed suit, asking me to enjoin the Pennsylvania Republican Party, Donald J. Trump for President, Inc., and others from illegally conspiring to suppress minority voting during the November 8 national election. Plaintiff relies upon newspaper and Internet stories, YouTube videos, unattributed reports, and judicial decisions—some decades old; others years, months, or weeks old.  Remarkably, Plaintiff did not actually move for injunctive relief until Thursday, November 3, after I ordered it to do so. Plaintiff has not explained this delay, which has crippled Defendants' ability to respond, made relief impracticable, and likely precluded appellate review of this Memorandum and Order before tomorrow's election.  Moreover, Plaintiff has produced no evidence of any planned voter intimidation in this District.  Finally, insofar as Plaintiff asks me to enjoin conduct that is already prohibited by criminal statutes, such an injunction is impermissible.

After considering all the Parties' submissions and their presentations at today's hearing, I conclude that because Plaintiff has not made the required "clear showing" of entitlement to the relief it seeks, I will deny its Motion.

**EXHIBIT A**

I.     **Procedural History**

Beginning on October 30, 2016, state Democratic parties have filed six identical lawsuits and claims for emergency injunctive relief against different state Republican parties, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal Inc., alleging imminent voter intimidation in violation of the Voting Rights Act of 1965 and the Civil Rights Act of 1871. (Doc. No. 1; see also No. 16-3752, Doc. No. 1 (D. Ariz. Oct. 31, 2016); No. 16-13924, Doc. No. 1 (E.D. Mich. Nov. 4, 2016); No. 16-2514, Doc. No. 1 (D. Nev. Oct. 30, 2016); No. 16-1288, Doc. No. 1 (M.D.N.C. Nov. 4, 2016); No. 16-2645, Doc. No. 1 (N.D. Ohio Oct. 30, 2016)); 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3).

On October 30, Plaintiff filed its Complaint here, seeking emergency declaratory and injunctive relief. (Doc. No. 1 ¶¶ 6, 16, 74, 80.) Oddly, it filed no motion for emergency relief, nor did it seek expedited discovery. On Wednesday, November 2, when Plaintiff still had filed no motion, I ordered Plaintiff to do so by November 3. (Doc. No. 10.) The next day, Plaintiff filed its Motion for a Temporary Restraining Order and/or Preliminary Injunction, but still did not seek expedited discovery. (Doc. No. 14.)

I gave Defendants only 24 hours to respond to Plaintiff's Motion. Accordingly, I received the RPP's Response, and the RPP and Trump Campaign's Joint Response, late on Friday, November 4. (Doc. Nos. 26, 41.) Over the weekend, Plaintiff filed a Reply, the Trump Campaign filed a sur-reply, and Plaintiff filed a sur-sur-reply. (Doc. Nos. 29, 30, 35.) The RPP has also moved to dismiss for failure to state a claim. (Doc. No. 31.) Plaintiff has filed proofs of service as to Mr. Stone and STS. (Doc. Nos. 15, 16, 33.) Counsel for Mr. Stone and STS appeared at today's hearing and argued that neither Defendant had been properly served. Counsel also filed a legal memorandum in which Mr. Stone and STS ask me to deny injunctive

relief. (Doc. No. 42.)

At the hearing I conducted earlier today, Plaintiff called two witnesses who, as I describe below, testified to little more than their dismay at Mr. Trump's statements and a concern that those statements might discourage minority voters.

The relief Plaintiff now seeks is a broad "obey-the-law" injunction. Plaintiff initially asked me to restrain and enjoin the RPP, the Trump Campaign, Mr. Stone, STS, "and those persons who are in active concert or participation with them" from:

> a. Funding, encouraging, organizing or otherwise supporting, individuals who are not officially appointed poll watchers under Pennsylvania law to be present at or around polling places or voter lines to challenge, investigate, interfere, or otherwise act to prevent any person from voting, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature (and/or stating to) individuals that voter fraud is a crime, or describing the penalties under any State or Federal statute for impermissibly casting a ballot.
>
> b. Monitoring polling places, or permitting, encouraging, or assisting individuals to monitor polling places, including but not limited to confronting potential voters and verifying their eligibility at the polls, distributing literature (and/or stating to) individuals that voter fraud is a crime, or describing the penalties under any State or Federal Statute for impermissibly casting a ballot, if the proposed monitor does not meet the statutory requirements for service as a poll watcher;
>
> c. Gathering or loitering within ten (10) feet of a polling place, or permitting, encouraging, or assisting any individuals to gather or loiter within ten (10) feet of a polling place, unless such person is one of the identified poll watchers for each candidate or party who may be present in a polling place at any time;
>
> d. Interrogating, interfering with, or verbally harassing voters or prospective voters, or training, organizing, or directing others to do the same, with the sole exception of questioning that is explicitly authorized by Pennsylvania law;
>
> e. Following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles, or training, organizing, or directing others to do the same;

    f.  Recruiting, training, organizing, or deputizing any persons to question, voters at Pennsylvania polling locations under the guise of the purported "exit polling" or "citizen journalist" operations organized and encouraged by Defendants Stone and Stop the Steal;

    g. Otherwise organizing efforts to engage in voter intimidation.

(Doc. No. 14-1.)

At 1:59 a.m. this morning, Plaintiff filed an Amended Proposed Order, asking me to restrain and enjoin Defendants from:

    a.  Blocking the entrance to the polling place;

    b.  Asking voters for documentation when none is required;

    c.  Disrupting voting lines inside and outside of the polling place;

    d.  Disseminating false or misleading election information;

    e.  Ostentatious showing of weapons at a polling place;

    f.  Photographing or videotaping voters to intimate [sic] them;

    g.  Frivolous challenges to voters that are made without a stated good faith basis;

    h.  Verbal or physical confrontation of voters by persons dressed in official-looking uniforms;

    i.  Violence or using the threat of violence to interfere with a person's right to vote.

(Doc. No. 34.) Plaintiff also asks me to order Stone and STS to abide by and distribute guidelines that those Defendants have purportedly proposed. (See id. at 2.)

On November 4, the Ohio District Court granted what appeared to be a nationwide injunction prohibiting Defendants Trump Campaign, Mr. Stone, STS, as well as other non-party "individuals or groups, including groups associated with the Clinton for Presidency [sic] campaign," from violating the law. (Doc. No. 30-4.) But see Perez v. Ohio Bell Tel. Co., No. 15-3303, 2016 WL 3755795, at *6 (6th Cir. July 14, 2016) ("The Supreme Court has warned

against 'sweeping injunction[s] to obey the law' and has cautioned courts about their 'duty to avoid' such orders." (quoting Swift & Co. v. United States, 196 U.S. 375, 401 (1905))). Yesterday, the Sixth Circuit stayed the injunction, finding that the District Court had abused its discretion because the plaintiff (the Ohio Democratic Party) had not demonstrated it was likely to succeed on the merits of its suit. (Doc. No. 30-5.)

On the same day the Ohio Court issued its injunction, the Arizona District Court denied all relief. (Doc. No. 30-3.) The Nevada District Court denied relief against Trump and the state Republicans, deferring a ruling on Mr. Stone and STS pending a hearing to be held this afternoon. (Doc. No. 30-2.)

Today, the Middle District of North Carolina held oral argument in the suit there. (See No. 16-1288, Doc. No. 7 (M.D.N.C. Nov. 5, 2016).) As of this writing, there has been no substantive activity in the Michigan case. (See No. 16-13924 (E.D. Mich.).)

Finally, sometime yesterday, Plaintiff subpoenaed RPP Chairman Rob Gleason—who resides some 240 miles away in Johnstown—to appear at the hearing this morning (the day before Election Day) and bring with him, *inter alia*, all Republican Party documents relating to its poll watching activities. Because the subpoena is vexatious and abusive, I granted the RPP's Motion to Quash earlier this morning. (See Doc. Nos. 32, 38.)

## II. Standing

Plaintiff alleges that it is "a state party organization affiliated with the [National] Democratic Party," and that it "works 'to elect Democrats from the top of the ticket on down' in local, county, state, and federal elections." (Doc. No. 1 ¶ 7 (citation omitted).) Defendants do not dispute that Plaintiff has standing to bring the instant suit, which is intended to protect the interests of both Democratic candidates running for office and Democratic voters. (Id. ¶ 14.) I

agree that Plaintiff has standing to proceed. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 180 (2000); Warth v. Seldin, 422 U.S. 490, 511 (1975); Constitution Party of Pa. v. Aichele, 757 F.3d 347, 368 (3d Cir. 2014).

### III.  Legal Standards

#### A.  Preliminary Injunction

Rule 65 authorizes me to issue the injunctive relief Plaintiff seeks. See Fed. R. Civ. P. 65(a). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller, Fed. Prac. & Proc. § 2948 (3d ed. Apr. 2016)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted). The moving party bears the "heavy burden" of showing that these elements weigh in favor of a preliminary injunction. Republican Party of Pa. v. Cortés, No. 16-5524, 2016 WL 6525409, at *4 (E.D. Pa. Nov. 3, 2016) (citing Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 210 (3d Cir. 2014), and Punnett v. Carter, 621 F.2d 578, 588 (3d Cir. 1980)).

#### B.  Voting Rights Act of 1965

Section 11(b) of this Act, as amended and codified, provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b); see also 28 U.S.C. § 1343(a)(4) (providing private cause of action "under any Act of

6

Congress providing for the protection of civil rights, including the right to vote").

### C. Civil Rights Act of 1871

This Act, as amended and codified, provides that

> if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

### IV. Discussion

As Judge Pappert recently stated in rejecting the RPP's belated request for Election Day injunctive relief: "There was no need for this judicial fire drill and Plaintiff[] offer[s] no reasonable explanation or justification for the harried process [it] created." Cortés, 2016 WL 6525409, at *4. The same situation obtains here. Plaintiff has not explained what it learned in the last month or even the last week that created emergent conditions. On the contrary, Plaintiff has long known of the acts and statements on which it bases its claims. For instance, Plaintiff emphasizes an inapposite 2004 Complaint and TRO filed against Senator John Thune, seeking to enforce the District of New Jersey's 1982 and 1987 Consent Orders. (Doc. Nos. 14-21, 14-23.) Plaintiff also points to purported voter intimidation by the Republican mayoral candidate during Philadelphia's 2003 election. (Doc. No. 14-19 at 7-8.) Plaintiff also offers comments ostensibly made by Mr. Trump going back to early August. (See, e.g., Doc. Nos. 14-9, 14-12).

During today's hearing, I repeatedly asked Plaintiff to explain its dilatory conduct and to identify any recent occurrence that compelled it to seek emergency relief so close to Election Day. Plaintiff was unable to do so. Significantly, Plaintiff has not alleged that Defendants have

intimidated voters in the four states that allow early voting—Arizona, Nevada, North Carolina, and Ohio—where suits identical to the instant suit have been filed. Plaintiff has not explained why it filed its Emergency Motion only two business days before the election—again, only after I ordered it to do so. (See Doc. No. 10.) Nor has Plaintiff explained why it failed to seek expedited discovery, opting yesterday instead to subpoena Mr. Gleason and a cache of documents. Remarkably, during today's hearing, Plaintiff stated that it had not sought expedited discovery because it believed that Defendants would voluntarily produce all discoverable materials without being formally asked to do so.

Plaintiff's dilatory conduct "weighs decidedly against granting the extraordinary relief [it] seek[s]"—especially "where, as here, an election is looming." Cortés, 2016 WL 6525409, at *3 (citing United States v. City of Phila., No. 06-4592, 2006 WL 3922115, at *2 (E.D. Pa. Nov. 7, 2006) (citing in turn Purcell v. Gonzalez, 549 U.S. 1 (2006))); see also Crookston v. Johnson, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so."). The election will be underway in a matter of hours.

Plaintiff's failure to take discovery has compelled it to rely almost entirely on media reports. Because the Federal Rules of Evidence do not strictly apply during preliminary injunction proceedings, I must exercise discretion in "weighing all the attendant factors, including the need for expedition, to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 719 (3d Cir. 2004) (internal quotation marks and citation omitted).

The plaintiff seeking an injunction will typically support her request with an affidavit, verifying that the facts alleged are true and correct according to her best information, knowledge, and belief. See Fed. R. Civ. P. 65(b)(1)(A) (requiring "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant" for TRO); 11A Wright & Miller, Fed. Prac. & Proc. § 2949 (3d ed. Apr. 2016) ("Affidavits are appropriate on a preliminary-injunction motion and typically will be offered by both parties. . . . All affidavits should state the facts supporting the litigant's position clearly and specifically." (footnote omitted)).

Plaintiff has produced its evidence in an Appendix comprising online newspaper articles and other reports and statements—almost all having nothing to do with this District. (See Doc. Nos. 14-6, 14-7, 14-9, 14-11, 14-12, 14-13, 14-14, 14-15, 14-16, 14-17, 14-18, 14-19, 14-20, 14-22, 14-24, 14-25, 14-27.) The Appendix is "verified" by one of Plaintiff's lawyers, who avers only that the exhibits are accurate copies. (See Doc. No. 14-3.) He says nothing about the truth of their content. (See id.)

I am thus compelled to base a ruling that could restrict Defendants' Election Day speech and conduct on media reports because Plaintiff has contrived to transform this litigation into a mad scramble. Although I could deny relief on this ground alone, given the importance of the voting rights Plaintiff alleges are threatened, I will consider all the Winter factors. See Cortés, 2016 WL 6525409, at *1 (citing unreasonable delay as a basis for denying injunctive relief); Smart Vent Prods., Inc. v. Crawl Space Door Sys., Inc., No. 13-5691, 2016 WL 4408818, at *12 (D.N.J. Aug. 16, 2016) (delay "knocks the bottom out of any claim of immediate and irreparable harm").

## A. Likelihood of Success on the Merits

To make out this factor, "the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). The Third Circuit has held that "a sufficient degree of success for a strong showing exists if there is a 'reasonable chance, or probability, of winning.'" In re Revel AC, Inc., 802 F.3d 558, 568-69 (3d Cir. 2015) (quoting Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)). Plaintiff alleges that the Trump Campaign, Mr. Stone, STS, and the RPP "are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election." (Doc. No. 14-2 at 2.) Like the Arizona and Ohio Democratic Parties, Plaintiff here has not made the requisite "clear showing" that it will prevail on the merits of its claims.

To succeed on its Voting Rights Act claim, Plaintiff must show that Defendants acted or attempted "to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). To succeed on its Civil Rights Act claim, Plaintiff must show that Defendants conspired to do so. 42 U.S.C. § 1985(3). Plaintiff has not demonstrated a likelihood of succeeding on either claim.

Plaintiff relies heavily on Defendants' alleged statements as reported in online newspaper articles. These statements were made in connection with the upcoming election. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010) ("Speech is an essential mechanism of democracy . . . . The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (internal quotation marks and citations omitted)). Once again, virtually none of the statements was made in this District or suggested that any illegal activity would occur in this District. Moreover, as the Arizona District Court found, some

of these statements are taken grossly out of context. (Doc. No. 30-3 at 16.) The same is true here. For example, Plaintiff opens its brief with the following claim:

> The stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, 2016, is to depress voter turnout, and particularly minority voter turnout—in the official's words: "We have three major voter suppression operations under way."

(Doc. No. 14-2 at 2 (quoting Doc. No. 14-11).) Plaintiff thus suggests that these "major voter suppression operations" are targeted at intimidating minority voters. In context, however, it is clear that the "unnamed official" is plainly describing protected political activity:

> "We have three major voter suppression operations under way," says a senior official. They're aimed at three groups Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans. Trump's invocation at the debate of Clinton's WikiLeaks e-mails and support for the Trans-Pacific Partnership was designed to turn off Sanders supporters. The parade of women who say they were sexually assaulted by Bill Clinton or harassed or threatened by Hillary is meant to undermine her appeal to young women. And her 1996 suggestion that some African American males are "super predators" is the basis of a below-the-radar effort to discourage infrequent black voters from showing up at the polls—particularly in Florida.

(Doc. No. 14-11 at 6-7.) In context, these are not "suppression" efforts at all, and they do not appear designed to threaten or intimidate voters. Rather, they are coarse efforts to convince Secretary Clinton's likely supporters not to vote for her.

Plaintiff also points to the Trump Campaign's "signup form on its website for supporters to sign up to be 'Trump Election Observers' in order to stop 'Crooked Hillary From Rigging this Election.'" (Doc. No. 14-2 at 4 (quoting Doc. No. 14-5).) Plaintiff thus alleges that Mr. Trump is "further encouraging his supporters to join in a common plan to 'watch' voters in 'certain areas' of states like Pennsylvania for voter fraud." (Id.) Yet, Pennsylvania law allows poll watching, and Plaintiff has not shown that the poll watching proposed here will include any impermissible activity. See Cortés, 2016 WL 6525409, at *1-2 (describing the Pennsylvania

11

Election Code's poll-watching provisions (citing 25 P.S. § 2687)). Indeed, Defendants point out that the Clinton campaign is engaged in the same exercise. (Doc. No. 41 at 11); see Join Victory Counsel, HillaryClinton.com, https://www.hillaryclinton.com/forms/protect-the-vote ("Volunteer to protect the vote as a poll observer this election cycle.") (last visited Nov. 7, 2016).

To show the "conspiracy" between Defendants RPP and Trump Campaign, Plaintiff offers an August 3, 2016 statement purportedly made by Governor Pence at a town hall event: "[T]he Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity." (Doc. No. 14-2 at 10 (quoting 8-3 Replay: Pence Denver Rally Town Hall at 16:22-17:27, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16).) Similarly, Plaintiff offers RPP Chairman Gleason's early-August statement to the Washington Post that he was "glad to hear" that Mr. Trump was becoming focused on voter fraud and "taking additional measures to recruit poll watchers in Philadelphia," as well as the RPP's now-unsuccessful effort to invalidate restrictions on Pennsylvania poll watchers. (Doc. No. 14-2 at 10-11 (citing Doc No. 14-9 and Complaint, Cortés, No. 16-5524, Doc. No. 1 (E.D. Pa. Oct. 21, 2016).) Assuming these purported statements accurately reflect actions that have actually been taken, no voter intimidation is even suggested. Once again, the Pennsylvania Election Code explicitly allows candidates and political parties to appoint poll watchers who "help 'guard the integrity of the vote.'" See Cortés, 2016 WL 6525409, at *1-2 (quoting Tiryak v. Jordan, 472 F. Supp. 822, 824 (E.D. Pa. 1979)); 25 P.S. § 2687.

As to Mr. Stone and STS, Plaintiff alleges that they "are actively recruiting Trump supporters for 'exit polling,' specifically targeting nine Democratic-leaning cities with large minority populations, including Philadelphia." (Doc. No. 14-2 at 6 (citing Doc. No. 14-6).) Mr.

Stone and STS have purportedly signed up 2822 volunteers to engage in "exit polling," including 150 volunteers in Pennsylvania. (Id.)  Yet, it is not clear that STS is even operational. See Robert Kuniegel, Where Is the Training for Exit Polls[?], Stop the Steal (Oct. 29, 2016), https://stopthesteal.org/where-is-the-training-for-exit-polls ("I have no idea where this post is going or if anyone will see it.  I suspect that no one will.  I have 10 people that wish to do exit polling in Philly and have tried for one month to find a way to get assigned and or trained.").  In any event, "the act of exit polling . . . constitute[s] protected expressive speech" under the First Amendment.  See PG Pub. Co. v. Aichele, 705 F.3d 91, 100-01 (3d Cir. 2013) (citing Daily Herald Co. v. Munro, 838 F.2d 380, 382 (9th Cir. 1988)); see also Daily Herald Co., 838 F.2d at 384 ("[E]xit polling constitutes speech protected by the First Amendment, not only in that the information disseminated based on the polls is speech, but also in that the process of obtaining the information requires a discussion between pollster and voter.").  As the Arizona District Court concluded, exit polling is permissible even if it is not "scientific" and those conducting it are not professional pollsters.  (See Doc. No. 30-3 at 19.)

      Finally, Plaintiff alleges that the conspiracy to intimidate minority voters "reaches beyond the defendants," discussing at length the activities of "white nationalist, alt-right, and militia movement groups" that have been "[e]nergized by Trump's candidacy."  (See Doc. No. 14-2 at 11-12 (citing Doc. No. 14-25).)  Unless it is psychic, Plaintiff has no idea who might have been "energized by" Mr. Trump.  Plaintiff's heated suggestion does not even rise to the level of speculation.

      In sum, Plaintiff has not shown that any Defendant has engaged or will engage in voter intimidation in this District, an essential element of both of Plaintiff's claims.  Plaintiff has thus failed to demonstrate that it is likely to succeed on the merits of either claim.

### B. Likelihood of Irreparable Harm

I agree with Plaintiff that a violation of voting rights would work an irreparable harm for which there is no adequate remedy at law. See Council of Alt. Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997) (infringement on voting rights "cannot be alleviated after the election"). I also agree with Plaintiff that given this nation's troubled history, the federal courts must take special care to protect the voting rights of minority communities. As I have discussed, however, Plaintiff has not made out even the possibility—much less the likelihood—that Defendants will intimidate *any* voters in this District.

During today's hearing, Plaintiff called Reverend Mark Kelly Tyler of Mother Bethel A.M.E. Church and former Philadelphia Councilman Angel L. Ortiz. Neither witness knew of any actual voter intimidation efforts or of any voters who had actually been intimidated. Rather, both were concerned that Mr. Trump's statements "might" or "could" intimidate African-American or Latino voters. This is not proof of the likelihood of harm. See ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" (citation omitted)).

### C. Balance of Equities and the Public Interest

Because these factors are intertwined, I consider them together. To prevent unproven voter intimidation, Plaintiff asks me to curtail Defendants' right to free expression and speech. U.S. Const., amend. I; Citizens United, 558 U.S. at 326-27 ("Courts, too, are bound by the First Amendment . . . [and] must give the benefit of any doubt to protecting rather than stifling speech." (internal quotation marks and citation omitted)); id. at 340 ("[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence."). Yet, virtually

all the minatory acts Plaintiff asks me to enjoin are already proscribed by criminal statutes, subject to severe punishment.  See, e.g., 18 U.S.C. § 594 (actual or attempted intimidation, threats, or coercion in federal elections punishable by up to one year's imprisonment and a fine); 25 P.S. §§ 3527 (interference with election officials, blocking the entrance of a polling place, voter intimidation, various acts of voter fraud, and conspiracy punishable by up to seven years' imprisonment and a $15,000 fine), 3528 (voter intimidation at a polling place at which one is not entitled to vote punishable by up to seven years' imprisonment and a $15,000 fine), 3547 (use or threat of force or duress punishable by up to two years' imprisonment and a $5000 fine), 3552 (punishing any person convicted of willfully violating the Election Code with four years' disenfranchisement).  Moreover, any coordinated efforts (much less a "conspiracy") between the Trump Campaign and STS would violate federal election law.  See, e.g., 52 U.S.C. § 30116(a)(7); 26 U.S.C. § 527.

The Supreme Court has long cautioned courts about their "duty to avoid" issuing "sweeping injunction[s] to obey the law."  Swift & Co., 196 U.S. at 401; see also Belitskus v. Pizzingrilli, 343 F.3d 632, 650 (3d Cir. 2003) (injunction impermissibly "require[d] defendants 'to obey the law' in the future . . . a requirement with which they must comply regardless of the injunction" (quoting SEC v. Warren, 583 F.2d 115, 121 (3d Cir. 1978))).  That admonition is especially apposite here, where the broad injunction Plaintiff seeks would itself curtail the constitutional rights of Defendants.  For instance, Plaintiff asks me to enjoin Defendants from "disseminating false or misleading election information."  (Doc. No. 34.)  Virtually all "election information" could be deemed "false" or "misleading," depending on the beholder.  The broad prohibition Plaintiff seeks could thus effectively silence Defendants' political speech on Election Day.

15

In these circumstances, the balance of equities and public interest factors weigh against the issuance of a preliminary injunction.

## V.     Conclusion

Our Republic is premised on the right of its citizens to select their leaders.  Had Plaintiff made any credible showing—much less the required clear showing—that Defendants intended to jeopardize that right, I would not hesitate to take immediate action.  Plaintiff has made no such showing, however.  Its belated, inflammatory allegations appear intended to generate only heat, not light.  Presumably, that is why identical efforts have so far been rejected by the Arizona and Nevada District Courts and the Sixth Circuit.  I will also deny Plaintiff's eleventh-hour request for emergency injunctive relief.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____
Paul S. Diamond, J.